THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TERRY NELLONS, Defendant-Appellant.

First District (5th Division)   No. 83—1978

Opinion filed December 14, 1984.—Rehearing denied January 25, 1985.

Steven Clark and Scott Graham, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and Erin J. Jennings, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the decision of the court and the following opinion:

Following a bench trial, defendant was convicted of rape, robbery, and home invasion and sentenced to concurrent terms of eight years for rape and home invasion and six years for robbery. The significant

contention by defendant on appeal is that there is a reasonable doubt as to his guilt on all offenses where the complaining witness' identification testimony was not clear and convincing and his alibi was uncontroverted. Since there is agreement by two justices with this contention, the other issue raised by defendant will not be discussed.

The complaining witness testified that on June 1, 1982, between 10 and 11 a.m., she parked her car near her apartment building at 440 West Barry Street in Chicago, having just returned from a trip to Cincinnati. She removed her luggage and entered the building lobby. She rode the elevator to the fourth floor and carried her luggage to her apartment—No. 401. As she was unlocking the door, a black man—whom she identified in court as defendant—came out of the stairwell 10 feet away and approached her. He asked the whereabouts of Marco or Marcus, whom she knew to be the landlord. She responded that he was on one of the upper floors, and defendant reentered the stairwell but reappeared while she was trying to remove her key from the door lock. He asked whether he could use her telephone, and when she refused his request he "cornered" her by extending his arms so that she was between him and the wall. He then opened the apartment door, pushed complainant into the apartment, causing her to fall on the floor, and he locked the door. She began screaming, and he jumped on top of her, held her wrists with one hand, and put his other hand over her mouth. When she struggled to free herself, he slapped her on the mouth, cutting her lip, and told her that he had escaped from a penitentiary, that he had a knife and a gun, and said that he would kill her if she did not stop screaming. She continued to scream and struggle, and he again told her to behave or he would kill her. He asked for her valuables, and, when she refused to tell him where they were, he pushed her into the bedroom, where he tried to tie her hands behind her with some belts he had taken from her dresser drawers. She was able to free her hands and tried to get up, but he threw her back on the floor, pulled off her clothing, and pushed her onto the bed. She broke loose and ran to the door, but he caught her and pushed her back onto the bed, where he raped her. Afterwards, he removed jewelry valued at several thousand dollars from her dresser and took her address book and photographs of her boyfriend and grandmother. He then wiped off the jewelry boxes and placed her property into a plastic yellow and black or brown drawstring shoebag and left the apartment. She called the police and the director of security at the nearby hospital where she worked as a nurse.

She testified also that she described her assailant to the responding police officer as a dark-complexioned black man in his early twen-

ties, about six feet tall, weighing about 170 to 175 pounds, with a very short, neat, tight curly Afro hairstyle and having acne from "his chin line, lower chin line down the neck, down by the ears." She also told the officer that he was wearing a brand new navy blue jacket with a zipper, a long-sleeved rugby shirt which had broad horizontal navy blue and gold stripes with a white collar and cuffs, light blue polyester pants which were too big for him, brown socks, brown underwear, and "white-beige eyelet tie shoes" which had pointed toes and low heels. She identified State's exhibit No. 10 as "the same shoes that the man was wearing."

On June 5, 1982, two police detectives showed her six photographs, out of which she identified a picture of defendant as her assailant. Later that day, she viewed a lineup at which she again identified defendant.

On cross-examination, she said she specifically told the officer that her assailant had eyelet shoes and had scars on his arms. At trial, she said that he had one scar on his arm, which looked life a knife scar having "a lot of scar tissue" and "the size of a knife blade." She admitted that defendant was the only one of the six men in the lineup who was wearing light blue slacks and clean beige shoes, and she was told in advance that he would be in the lineup, which she viewed for two minutes from behind a viewing glass; but, to be certain of her identification, she approached each of them to compare their height to hers.

Upon questioning by the court, complainant said that in her duties as a nurse she described black people in her charts only as either light or dark complexioned, and that she would describe defendant as dark skinned. The court commented that he considered defendant to be of a medium or lighter complexion. Upon further questioning by the court, she said that her assailant was with her for over an hour until he left her apartment about 11:40 a.m., and while she believed he had a scar on his arm, she could not say exactly where it was.

Officer Roberts testified that on June 1, 1982, at 11:55 a.m., he received a rape report and proceeded to complainant's apartment. She described her assailant as being a black male, age 24, 5 feet 11 inches tall, weighing 170 pounds, wearing a blue jacket, blue jeans, a yellow and blue rugby-type T-shirt, white deck-type shoes like an older gentleman would wear, which had perforation holes in them, and maroon socks. She subsequently told him the offender had "scars on his arms" and acne marks on his neck.

On June 5, Officer Roberts was on routine patrol in the 2800 block of Broadway when his attention was drawn to defendant by his white shoes with perforated holes, and he also noticed that he resem-

bled the description of the person who had raped complainant. When he arrested defendant, he noticed a small, very thin scar on his right elbow about 1/4- or 1/2-inch in length. His police report shows that complainant told him her assailant had scars on both arms, but there is nothing in his report to indicate that she told him of any marks on his face or neck or that he was wearing eyelet shoes.

Detective Richards testified that on June 5 he showed complainant seven photographs from one of which she identified defendant as her assailant. Later that day, she identified defendant in a lineup. Subsequently, he interviewed defendant, who said that on June 1, he was on the south side of Chicago as a member of a magazine crew working out of Gary, Indiana, and that he had not been on the north side that day. He also told Richards that the shoes he was wearing when arrested on June 5 had been purchased by him in Gary on the morning of June 4, when he left during the breakfast meeting of the crew and returned with the new shoes. During the interview, Richards noticed that defendant had bumps under his chin.

Richards also said that defendant told him he worked for American Community Services and was living in a motel in Gary. He obtained a warrant and searched defendant's room, but did not find any of the property complainant said had been taken from her apartment nor any of the clothing she said her assailant was wearing.

Robert Parker, of Gardena, California, who for eight years had been sales manager for American Community Services, Inc., a company selling magazine subscriptions to the general public, testified for the defense that in June 1982, the company had a sales staff of about 100 staying at the Sheraton motel in Gary. All of the staff were required to attend meetings at 7:30 a.m. every morning and a roll call was taken to assure their presence. After the meeting, which lasted about two hours, he usually would take a group of 10 to breakfast before driving them to the area they were assigned to work. The salesmen were required to wear a shirt and tie and were checked every day for compliance therewith. He stated that on June 1, 1982, the staff—including defendant—attended the 7:30 a.m. meeting, which lasted until about 9:30 a.m., and he then took defendant, who was wearing the required shirt and tie, and nine other staff members to a restaurant in Gary for breakfast—after which he dropped off defendant and Kim Brownlee at 95th and Western Avenue, in Chicago, about noon. At 4 p.m., he drove them to a different location to work until 7:30 p.m., when he returned and then drove them back to Gary. He stated that at breakfast on the morning of June 4, 1982, he gave defendant a $20 salary advance with which he purchased a pair of white shoes. Defendant returned with them while they were still at

breakfast. He obtained a receipt from defendant for the $20, which he gave the person who checked defendant in that day. He also testified that defendant did not own an automobile and did not have one that day.

Kimberlee Brownlee, from St. Louis, Missouri, a sales representative for American Community Services for three years, testified that on June 1, 1982, her group was staying at a motel in Gary, Indiana, and working the Chicago area. She attended the 7:30 a.m. meeting that morning, then went to breakfast with Robert Parker, defendant—whom she had known for one year at that time—and other sales people. Parker then drove them to Chicago, dropping her and defendant off about noon on Western Avenue in Chicago. They had never worked together before and, although they were supposed to work opposite sides of the street, they decided to stay with each other for about an hour so they could hear each other's sales pitches. They then split up, and she next saw defendant at the 4 p.m. pickup. Brownlee said that defendant was wearing a shirt and tie on that day.

Jan Lawler testified that on June 1, 1982, she was in the yard of her house at 10149 South Leavitt—two blocks west of Western Avenue and approximately seven blocks south of 95th Street—when sometime between 12:15 and 1:30 p.m. defendant approached her carrying a clipboard. He introduced himself and explained he was selling magazine subscriptions. She bought a $25 subscription to the Ladies Home Journal from him and testified that he was wearing a white short-sleeve shirt which was clean but frayed, with a tie hanging from an open collar, and dark pants with frayed cuffs. She saw no marks of any kind on his face or neck.

Defendant, who stated he was from Dayton, Ohio, testified that on June 1, 1982, he had been employed for one year as a salesman for American Community Services and had never been in the Chicago area prior to May 1982. On June 1, 1982, he was staying with other employees at the Sheraton motel in Gary, Indiana, and working the Chicago area. He was dressed in accordance with company regulations, which included "a tie, a nice pair of slacks, a nice decent shirt and clean pair of shoes." He attended the morning meeting which lasted from 7:30 to 9:30 a.m., after which his supervisor Robert Parker drove his group to a restaurant. After breakfast, Parker drove the group to Chicago, where he and Brownlee decided to work together for a time before they separated. Defendant made only one sale on his own that day—to Mrs. Lawler.

Defendant also stated that on June 4, 1982, he had been driven by Parker to the area of Addison and Broadway in Chicago, but was arrested about 12:30 p.m., after he worked for about one-half hour, and

was charged with disorderly conduct for allegedly having urinated near an apartment building. He was released from custody around 7:30 or 8 a.m. on June 5 and was walking down Broadway, back to the place where Parker had dropped him off on June 4, when he was arrested. At that time, he was wearing the white shoes which he had purchased on the morning of June 4 in Gary with a $20 advance from Parker. Defendant also testified that he was unfamiliar with the Chicago expressways and would not know how to get from Barry and Sheridan to 102nd and Leavitt, although he said that he had worked on Sheridan Road on May 27, 1982. He said that he had no car, and he denied owning a rugby shirt or maroon socks, but admitted having a scar on his right elbow, and he explained that the marks on his face on June 5 resulted from his not having shaved since the day prior, but that they were not on his face on June 1.

Following closing argument, defendant was found guilty, and when his motion for a new trial was denied, this appeal followed.

Opinion

I

It is essentially the contention of defendant that the time references in the uncontradicted testimony of Parker, Brownlee and Lawler support his position that he was not the person who committed the offenses charged on June 1, 1983. In this regard, we initially note that complainant said her assailant left her apartment at 440 West Barry (3300 North) at 11:40 a.m., and that she then watched him through her window, walking down the street towards Sheridan Road. However, both Parker and Brownlee testified that they were with defendant from 7:30 a.m. in Gary, Indiana, until Parker dropped him and Brownlee off at 95th and Western (2400 West) at noon on that day. Brownlee also stated that after they were dropped off, she worked with defendant for about an hour. Their testimony thus accounts for the presence of defendant on that day from 7:30 a.m. until about 1 p.m., and Lawler testified that it was between 12:15 and 1:30 that defendant walked into her yard at 10149 South Leavitt (close to seven blocks north of 95th and two blocks west of Western) and sold her a $25 subscription to the Ladies Home Journal. Documents produced clearly establish that this purchase was made from defendant. In addition, Parker testified that defendant did not own an automobile on June 1, 1983, and did not have one on that day.

The trial judge stated he belief that Lawler was an "impartial, honest and sincere type witness," and, although he made no state-

ment concerning Brownlee, he also said he did not disbelieve Parker but thought he "could have been mistaken about some of the time period," and on that basis he concluded that "there would have been sufficient time from the time he committed the occurrence to get back to that area [95th and Western] whether it be a half hour or whether it be 40 minutes." There is, however, nothing in the record to support his conclusions as to the time he said it would take to drive that distance or from which it could even be inferred that defendant could somehow have left 440 West Barry at 11:40 a.m. and arrived at the Lawler residence at 102nd and Leavitt between 12:15 and 1:30 p.m.

Parker, a 12-year employee and sales manager of American Community Services, testified that defendant did not own an automobile and did not have one on June 1, and both he and Brownlee—a three-year employee of that company—testified that they were with defendant from 7:30 a.m. until he was dropped off at noon at 95th and Western; Brownlee also testified that she worked with him for another hour. It is clear that on the basis of the uncontradicted testimony of Parker, Brownlee and Lawler it would have been impossible for defendant to have committed the offenses.

The only fault the court found with the testimony of any of these three witnesses was the possibility that Parker may have been mistaken about the time he dropped defendant off. However, to accept the conclusion of the court—that defendant committed the crimes—it would have to be assumed that Parker dropped him off at 95th and Western at about 9 a.m., since complainant stated she first observed the assailant in her apartment building between 10 and 10:30 a.m. It would also have to be assumed (a) that after defendant was dropped off, he somehow obtained an automobile and went directly to 440 West Barry Avenue for a purpose not related to complainant, since it is not likely he would have known she would be there, as she had just returned from a trip to Cincinnati; (b) that he had or somehow obtained different clothing and changed into them in the car; (c) that after leaving complainant's apartment at 11:40 a.m., he drove back to the 95th and Western area, changed his clothing again in the car, and walked into the Lawler yard, about nine blocks from 95th and Western between 12:15 and 1:30 p.m.; (d) that he abandoned the car, since Parker drove him back to Gary that night; and (e) that between June 1 and June 5, defendant was able to somehow dispose of the change of clothing and the thousands of dollars of jewelry and other articles complainant said were taken from her by her assailant, since he did not have them when at the Lawler residence and none were found in the search of his room by the police. There is no support in the record for any of these assumptions, nor is there—as stated above—any basis

for the conclusions of the trial court that defendant could have left complainant's apartment at 11:40 a.m. and arrived at the Lawler residence between 12:15 and 1:30 p.m.

█ While the uncorroborated identification testimony of a single witness, as is the case here, if it is positive and the witness credible, is sufficient to convict (*People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232), "evidence fairly tending to establish an alibi cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime charged, and if, from the entire record, there is a reasonable doubt of the guilt of the defendant because of the uncertainty of the identification, the conviction cannot stand." *People v. Kidd* (1951), 410 Ill. 271, 279.

█ In this case, the identification of the defendant as the assailant is not only negated by the unimpeached alibi testimony, but it is also weakened by a number of factors. First, complainant told Officer Roberts that her assailant was wearing a blue jacket, blue jeans, and a rugby-type T-shirt, yellow and blue in color; whereas Parker, Brownlee and Lawler all testified that defendant was wearing a white shirt and tie, which he was required by his employer to wear. While the trial court opined that defendant could have changed his clothing in the automobile he used that day, there is again nothing in the record indicating that he had clothing of the type worn by the assailant, and no such clothing was found in the search of his motel room. Second, it was complainant's testimony that she told Officer Roberts on June 1 that her assailant had what appeared to be "an acne running down his chin and his neck *** his chin line, lower chin line, down the neck, down by the ears"; however, neither the police report of Roberts nor his broadcast of her description made any reference to such a condition, and no other witness testified to a similar condition. Officer Richards, in his June 5 arrest report, stated only that defendant had "bumps on his neck."

Moreover, while neither Parker nor Brownlee were asked about any marks on his face or neck, Lawler—who was with defendant about 30 minutes—said that she saw no marks on his face or neck. Defendant testified that the bumps on his neck, seen by Officer Roberts, were a shaving rash. In any event, there is nothing in the record, other than complainant's statement, that defendant on June 1 had an acne or similar condition running from his chin line to his ears. Third, complainant told Roberts in a later interview (some unknown time after the first interview on June 1) that her assailant "had scars on his arms." There is nothing to this effect in Roberts' police report, and Officer Richards' arrest report of June 5 shows that

defendant had only a very thin ¼- or ½-inch scar on his right elbow. Fourth, while complainant testified that the shoes defendant was wearing on June 5 were the same as those worn by her assailant on June 1, she also told Roberts that her assailant was wearing "a pair of white-beige eyelet tied shoes"; whereas, Roberts testified that when defendant was arrested on June 5, he was wearing white shoes with perforations, and there is nothing in the record to indicate that he was wearing eyelet shoes on June 5.[1] Moreover, defendant testified that the shoes he was wearing on June 5 had been purchased in Gary on the morning of June 4, before he was driven to his assigned work area, and that they were bought with a $20 advance he received from Parker for that purpose. Parker had previously testified that he made a salary advance of $20 to defendant while they were at breakfast on June 4, for the purchase of a pair of shoes, and that defendant returned to the restaurant wearing the new shoes. Fifth, complainant, in describing her assailant to the police and at trial, did not mention that he had a voice defect, and the trial judge made a statement for the record that defendant had a noticeable speech impediment. Sixth, complainant described her assailant as a dark-complected black male, whereas the trial judge noted his opinion that defendant was of "medium or a lighter complexion." Seventh, the assailant was in complainant's apartment for about one hour, and although an officer told defendant that fingerprints were found in her apartment, there was no testimony that they were defendant's. Eighth, defendant's testimony was unimpeached, contradicted only by complainant's identification of him.

While it is true, as the State points out, that the trier of fact is not obligated to believe alibi testimony (*People v. Dotson* (1981), 99 Ill. App. 3d 117, 424 N.E.2d 1319), as stated above, the trial court here made no statement to the effect that he did not believe the testimony of any of the alibi witnesses. To the contrary, he stated that Lawler was an "impartial, honest and sincere witness" and that he did not disbelieve Parker—stating only that he believed Parker was mistaken about the time he dropped off defendant.

In the light of the above, it is the belief of the majority here, from an examination of the entire record, that there is reasonable doubt as to defendant's guilt.[2] *Cf. People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434.

---

[1]The shoes received in evidence and identified by complainant as having been worn by her assailant are not included in the record.

[2]Justice Sullivan, contrary to the conclusion in the concurring opinion, finds that the evidence is sufficient to prove that a rape occurred but believes there is insufficient evidence to prove that it was committed by this defendant.

For the reasons stated, the judgment is reversed.

Reversed.

JUSTICE PINCHAM, concurring in the decision:

I agree that the defendant's alibi evidence was positive and unimpeached. I agree further that the evidence failed to establish beyond a reasonable doubt that it was the defendant who committed the acts attributed to him by the complainant and that the judgment of conviction should be reversed. I am also of the opinion, however, that the evidence failed to establish the commission of the offense of rape beyond a reasonable doubt. The experiences related by the complainant in this case are quite bizarre. Based on her testimony, it could be persuasively argued that the incident arose out of "a date gone sour," that is, after an act of voluntary intercourse in her apartment her date, whoever it was, feloniously appropriated her property and evoked her enmity.

The complainant testified that on Tuesday, June 1, 1982, at approximately 10 a.m., she got out of her car and walked with her luggage to her apartment building. The lobby was well lit. As she waited for the elevator to arrive, a black man who was approximately her height walked down the hall. The complainant got on the elevator with her luggage, went to the fourth floor and proceeded down the hall to her corner apartment. She put her key into the lock, unlocked the door, and, with her luggage on the floor, realized that she had a deadbolt lock on the door. She fumbled with the deadbolt. The black man walked up from the stairwell, which was about 10 feet from her apartment. She identified this man as the defendant, Terry Nellons. The complainant testified that her assailant was breathing very heavily, as if he had run up the four flights of stairs.

If this testimony is accepted, it must also be accepted that the assailant knew, as he climbed the stairwell to the fourth floor, that the complainant lived on the fourth floor and in which apartment she lived. The assailant would have also known that the complainant would alight from the elevator on that floor and that he could climb the four flights of stairs simultaneously with the elevator and arrive at her apartment door instantaneously with her.

The complainant testified further that her assailant approached her face-to-face and asked, "Do you know where Marco or Marcus is?" The landlord's name was Margo, and the complainant told her assailant that he, Margo, was on one of the upper floors. The assailant then turned and went back into the stairwell.

Again, if this testimony is accepted, it must also be accepted that

this assailant had some knowledge of Margo's presence in the building. As hereafter pointed out, there is not one scintilla of persuasive evidence that the defendant had even been in or had any knowledge of this building.

The complainant further testified that she took her key out of the deadbolt lock, put it into the bottom lock and opened the door. She could not remove her key and as she tried to get it out of the lock her assailant rushed up and said, "I want to use your phone," or, "May I use your phone." The complainant said no, he could not use her phone and told him to go to the first floor, that there was a phone there. She testified that at that point her assailant cornered her "arm-to-arm against the wall," with her back pinned against the wall, that her assailant stood there with his arms out, that she was between him and the wall, that as she tried to get her key into the lock he pushed the door open, pushed her into her apartment and that she fell on the floor. He threw her luggage in behind her, rushed in, closed and locked the door.

The complainant did not testify how her assailant locked the door, that is, by key, deadbolt or otherwise. Nor did she relate what action she took as he locked the door. In any event, to accept this testimony it must be accepted that her assailant knew that she would not flee down the corridor or stairwell or scream as he accosted and physically molested her at her apartment door in the hallway. Her assailant would also have known that if she screamed, no one in the 12 apartments on the fourth floor would hear her, and that if her screams were heard by her neighbors, no one would come to her aid. Moreover, if this testimony is accepted, it must also be accepted that her assailant knew that there was no one in the complainant's apartment when he pushed her in, entered and locked the door. This testimony of how the complainant and her assailant entered her apartment building and, ultimately, her apartment, is questionable.

The complainant testified further that when her assailant threw her down on the carpet in her apartment she screamed loudly. Her assailant threw his hand over her face and clasped his right hand over her mouth and lower jaw. She was lying on the floor. She could not breathe because he had his hand over her mouth and nose. She struggled to try to loosen his hand from her face. She kicked him in the groin and he backed off. She got her hand loose and they struggled. She pushed him away. He again slapped his hand over her face in a cupping motion which caused a small cut on her lip. He told her that he was an escaped convict from some penitentiary. She testified further that her assailant told her that he had a knife and a gun and that if she did not stop screaming he would kill her. She continued to

scream. The complainant was 5 feet 10 inches, comparable in size to her assailant. She said that he "took his arm and shoulder and wrapped it around in like a swimmer's brace" around her neck. When she attempted to run to the door, he tightened his grip. He pushed her toward the bedroom, and she turned around to run out. He pushed her real hard, and she landed on the floor in the bedroom.

The complainant's apartment had numerous windows with levelor blinds, which were all raised. It was a gorgeous, sunny day and her apartment was well lit. She had a very large bedroom window with levelor blinds, which were also up. The assailant went through the dresser drawers to find a belt. He took out two belts and put her hands behind her back as if he was going to handcuff her. He tried to wrap and secure the belts around her arms.

The complainant testified that she struggled free of the belts. She screamed to him not to hurt her. She screamed real loud, and he took her hands and put them above her head again. He reached into another drawer, took a pair of clear nylon pantyhose and put them over her head with one of his hands. She worked one of her hands loose and pulled it off. He took another pair of nylon hose and put it over her face and head. She ripped it off. He then put his hands above her head and started to kiss her. He kissed her on the mouth, the face, and neck. He forced her to the floor, sat on top of her, took his other hand and ripped open her blouse as she was lying on the floor. After he ripped open her blouse, he pulled her brassiere off. He did not unattach it, but just pulled it off. He took her leather belt apart, unhooked it, and then pulled down her pants and underwear.

The complainant's meticulous testimony of her numerous struggles with her assailant would suggest that she was not paralyzed by fear. (*People v. Rossililli* (1962), 24 Ill. 2d 341, 346-47, 181 N.E.2d 114; *People v. Keeney* (1973), 10 Ill. App. 3d 296, 300, 293 N.E.2d 492.) She testified that her assailant never displayed a weapon. He simply told her that he had a knife and a gun. But this mere verbal recitation of his possession of a gun or knife did not deter her from struggling with her assailant or prevent her from screaming, if her testimony is to be believed. Even though no weapon was displayed to her, and even though she was not too afraid to scream and struggle with her assailant, there is not one iota of evidence in the entire trial record that the complainant resisted by biting, scratching, hitting, stomping or kicking her assailant, except the one previously mentioned instance when she testified she kicked him in the groin. Nor is there one iota of evidence that her assailant ever hit, bit, scratched or kicked her.

Although the complainant testified that when her assailant

clasped his hand over her mouth it caused a small cut on her lip, there is not one bit of evidence which corroborates this testimony. Though the police took pictures of the dresser and bed in the apartment, not a single picture was taken of her. Her testimony that she had a small cut on her lip was not even corroborated by the medical examination she received after the incident. (*People v. Bain* (1972), 5 Ill. App. 3d 632, 283 N.E.2d 701.) There was not a single shred of evidence that she suffered one bruise (however slight), abrasion, tear, laceration or hyperesthesia.

Fifteen pictures of the complainant's apartment and furniture were admitted into evidence by the State. Yet, not a single garment, the blouse, brassiere, pants, belt or panties that were allegedly ripped and torn from her, was introduced. The State also made no attempt to account for the absence of this ostensibly corroborative evidence. (*People v. Szybeko* (1962), 24 Ill. 2d 335, 181 N.E.2d 176.) The complainant's uncorroborated account of her struggle and forced disrobing is therefore not clear and convincing.

Though not impossible, it would appear to be unusual for a rapist to completely disrobe his victim from full street attire to nudity, as the complainant testified. She further stated that after her assailant disrobed her, he pushed her over to the bed, pulled down the comforter and the sheet, pushed her into the bed and then pulled the sheet back up over her. This, too, appears to be rather strange behavior for a rapist. But the eccentricity of this rapist's conduct does not terminate here. The complainant testified further that her assailant then started to undress and took off all of his clothes. How he disrobed and simultaneously held her in bed is not clear from the evidence. Research fails to reveal a single case in which a rapist completely disrobed his victim and then himself as a prelude to forceable sexual intercourse. To do so would indicate his total oblivion to an expeditious departure.

Testifying further, the complainant stated that her assailant stood nude in front of her fourth floor window with the blinds up, tried to work the levelor blinds down, that he could not get them down and that he just forgot about it. The testimony that a rapist stood nude before a fourth floor, open window and attempted to close the blinds while his victim awaited in bed is also unconvincing.

The complainant further testified that after her assailant was unable to close the blinds, he pulled the bed sheet up, got in bed on top of her, started to kiss her face, lips and neck and then put his penis into her vagina and ejaculated. He then got out of bed and again pulled the sheet up over her, with just her face showing. This was indeed a most considerate rapist. He disrobed his victim, pulled the bed-

ding back to put his rape victim in bed, covered her with the bedding, undressed, unsuccessfully attempted to close the window blinds, raped his victim and thereafter pulled the sheet over her to her neck. To doubt this testimony is reasonable. To believe it beyond a reasonable doubt is unreasonable.

The complainant further stated that when her assailant got out of bed, there was a small vanity next to the bed where she had some towels. He took a hand towel (State's exhibit No. 9) and wiped his penis and legs. The complainant was proficient in giving the police investigator the towel, which the evidence established contained semen and spermatozoa, but which did not establish or corroborate rape. (*People v. Symons* (1961), 23 Ill. 2d 126, 130, 177 N.E.2d 185.) She neglected, however, to give the police investigator her torn and ripped blouse, brassiere, panties or pants which would have been corroborative evidence of rape, if a rape occurred.

Chicago police detective Robert W. Richards, a witness for the State, testified that he interviewed the complainant in the late afternoon of June 1, 1982, at the Illinois Masonic Hospital, and that at that time the complainant told him that after the sex act the offender got out of the bed, went to the bathroom for a towel and that thereafter, while he was going through her cabinets, she went to the bathroom. This post-intercourse conduct by the complainant and her assailant likewise fails to suggest that the intercourse was by force and against the complainant's will. Rather, it strongly suggests consent.

The complete uncorroborated episode as related by the complainant does not persuasively, clearly or convincingly establish that the act of sexual intercourse was by force, that the complainant was paralyzed by fear, or that she used her faculties and physical power to resist, or that she was overcome by physical force and was powerless to resist. *People v. Taylor* (1971), 48 Ill. 2d 91, 99-100, 268 N.E.2d 865; *People v. Rossililli* (1962), 24 Ill. 2d 341, 347, 181 N.E.2d 114.

The complainant testified that after her assailant wiped the brass part of the bed he pulled jewelry out of a glass container on her dresser and took papers and a picture of her boyfriend and grandmother from her drawer. He then held the pictures in front of her as she was lying in bed and said that if she told anybody what had happened he would call his Mafia friends and have them kill these two people and her family. He also had an address book of where she lived and her family's address and told her that there would be no problem for him to find her. He put her jewelry, which she valued at several thousand dollars, and other personal items into a plastic bag. The complainant said to him, "Now that you have everything, would you please leave." He became very angry with her and said that he had a

knife and a gun and that he was going to kill her. He stuffed a picture of her boyfriend into the bag, walked over to the head of the bed near her face and completely dressed. Apparently, when the complainant returned from the bathroom she got back in bed. Certainly the rapist did not have a gun or knife during the extended period that the complainant said he was nude. These uncorroborated events related by the complainant are inherently improbable, incredible and unbelievable. *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 1024-25, 443 N.E.2d 273.

The complainant testified further that after her assailant wiped around the bed, the glass items, glass jewelry boxes, the bed and himself, he put the towel on the bed, told her to stay where she was, and said that if she made any attempt to get up he would kill her. He left the bedroom, walked to the door to the hallway and closed the door behind him. Upon his departure, the complainant got out of bed, went to the telephone beside the bed and called the police. There is no evidence that the assailant made any effort to disengage the telephone before his departure. The complainant also testified that while on the telephone she looked out the window and saw her assailant walking toward Sheridan Road. Whether the complainant then saw the construction workers working on the sidewalk adjacent to the building, which she testified she observed upon her arrival at 10 a.m., is not disclosed. The record does disclose, however, through the testimony of the complainant and Officer Edward Roberts, who responded to her police call within 15 to 30 seconds, that the assailant departed at about 11:50 a.m. By the complainant's computation her encounter with her assailant, whether by force or otherwise, lasted over 1½ hours. Coupled with the previously mentioned questionable circumstances, this protracted period of time would appear to be far more compatible with consensual sex. In any event, the complainant's testimony of her assailant's departure hour supports the defendant's alibi. As previously stated, the evidence does not establish rape beyond a reasonable doubt.

A further comment on the defendant's alibi is appropriate. The defendant and Mrs. Jan F. Lawler testified that on June 1, 1982, between 12:15 and 1:30 p.m., the defendant sold Lawler a subscription to the *Ladies Home Journal* magazine in front of Lawler's home in Chicago. Lawler was mowing her lawn. Lawler testified that she paid the defendant for the subscription with a check and at her request the defendant wrote his name across the top of the check. She stated that she did not have the check with her at trial but that it was at her home. Lawler testified further that her children got out of school at 11:30 a.m. and arrived home around 10 to 12. Her children were

home at the time. She sent one of her children into the house for her checkbook. Lawler also stated that her husband was a broker at the Chicago Mercantile Exchange, which closed at 12:45 p.m., and that she had been talking to the defendant when her husband arrived home at about 1:20 p.m. The defendant testified that his trial exhibit No. 6 was an accurate photocopy of the invoice, or sales slip of Lawler's magazine purchase on which he wrote Lawler's name, address and zip code.

Lawler testified that in March or April, 1983, an assistant State's Attorney came to her home (perhaps because of information acquired during pretrial discovery about defendant's alibi). At trial, defendant's attorney asked Lawler:

"Q. Were you shown anything [by the assistant state's Attorney in your home] at that time?

A. I was shown two pictures, sir.

Q. Did you pick out those pictures, if you recall—or do you recall what you did?

A. I can remember looking at both pictures and saying do you really expect somebody to be recognized from these two pictures because *they were very poor pictures. One was so dark you could hardly see it. It was very foggy. The second picture was a little picture of him standing up and I said, this looks somewhat like him, but it is so foggy and so dark, I don't know how you can expect to be recognized from it.*

Q. Were you shown anything after that?

A. No." (Emphasis added.)

The assistant State's Attorney did not ever show Lawler State's exhibits Nos. 15, 16 or 17, which were clear pictures of the defendant taken after his arrest. Those pictures *were* shown to the complainant, however. If showing Lawler two "very poor," "very foggy" pictures was a subterfuge to create a circumstance out of which she could be impeached in her alibi testimony on behalf of the defendant, this deceitful attempt was bungled by Lawler's integrity, veracity and intelligence.

The trial judge expressly found Lawler to be an "impartial, honest, sincere-type of witness" and further stated, "I'm sure and I'm positive based upon what she said that it is this defendant that she talked to." Nevertheless, the trial judge found the defendant guilty. He should not have done so. I therefore concur in the reversal.

JUSTICE LORENZ, dissenting:

I respectfully dissent from my colleagues' majority and specially concurring opinions. I do not find the victim's identification of defend-

ant to be so uncertain, or her version of events to be so unsatisfactory, as to warrant setting aside the defendant's conviction. Nor do I believe his alibi was so strong as to require reversal.

The majority relies primarily upon defendant's alibi, placing him miles from the scene in different clothes, and concludes that the trial court's resolution of the evidential conflict had no basis in evidence. While true as far as it goes, this conclusion overlooks the factfinder's prerogative: here, the trial court was entitled to believe both the victim and the alibi witnesses, and still to find as a factual matter that the alibi did not exclude defendant's committing the crime. (See *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) Reasonable people might differ as to the level of doubt raised by the alibi evidence adduced in this case, but the trial judge resolved the facts against defendant, and I see no basis in the record to discard his finding.

The majority and concurring opinions point out what seem to be myriad inconsistencies in the victim's testimony. The majority cites identification testimony concerning acne, scars, complexion and speech impediment. Of course, inconsistencies in identification testimony go to the weight of the evidence, decided by the factfinder. (*People v. Guyton* (1972), 53 Ill. 2d 114, 290 N.E.2d 209.) The victim's identification, and the trial court's reliance upon it, were supported by the totality of circumstances, including her opportunity to view the perpetrator, her degree of attention, and the certainty of her identification. (See *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) I consider the problems cited by the majority to be matters of mere characterization. The "shoe" issue is a red-herring. The fact that defendant bought eyelet shoes on June 4 does not negate the inference that he possessed eyelet shoes on June 1.

Although the concurrence adopts the majority opinion, I believe the opinions are basically incompatible. The majority places defendant at 95th and Western at the time of the crime; the concurrence places him at 440 Barry. The opinions may be reconciled only if one believes that the victim consented, later became angry, and then, inexplicably, identified the wrong man.

Beyond this, the concurrence makes several points which I find unpersuasive. My colleague argues that if the victim's testimony is believed, then defendant knew where the victim lived, expected that he would arrive simultaneously at her doorway, and believed that she would not flee, scream or find aid nearby. On the contrary, the evidence indicates that the rape occurred on a weekday in the middle of

the day. From this, one might infer that many people were at work and few were visibly present at an apartment building. As easily as the concurrence assumes design, one might rather assume that defendant had Margo's name for some unknown reason and decided to invade the victim's apartment on impulse.

The concurrence seems to say that the man was too slow and too considerate to be a rapist. Illinois has outlawed all rapes: not just "fast" ones, and not just "cruel" ones. The opinion suggests further that the State did a poor job investigating and prosecuting the case. As may be, the trier of these facts was convinced beyond a reasonable doubt that defendant committed rape.

For the majority to have reached their conclusion, it is obvious that they have reassessed the credibility of witnesses and reweighed the evidence. In this case, the trial judge heard the witnesses' testimony and observed their demeanor, and he concluded that defendant was guilty of the crime charged. I would affirm the conviction.