THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN M. PHILLIPS, Defendant-Appellant.

First District (5th Division)    No. 1—86—2711

Opinion filed March 10, 1989.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Vickie E. Voukidis, and Joseph G. Howard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Defendant, John M. Phillips, was convicted of aggravated kidnaping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2) and aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14) following a bench trial and was sentenced to concurrent prison terms of six and four years, respectively.

For reasons set forth below, we affirm.

The following facts are undisputed. In the evening of June 23, 1985, Phillips met the complainant, M.B., and her friend, J.C., in Bootleggers, a singles' bar located near State and Division Streets in Chicago. After spending some time with Phillips, the two women accepted an invitation to go to his parked car for the purpose of indulging in illegal narcotics. M.B. got into the front passenger seat and J.C. got into the back seat behind Phillips. After lighting a marijuana cigarette, Phillips moved the car to a deserted area a short distance away.

Conflicting testimony as to subsequent events, as adduced at trial and pertinent to our disposition, is summarized below.

M.B. testified that Phillips parked the car, opened the glove box, and retrieved a mirror and knife. When she asked the purpose of the knife, Phillips related that it was "to cut up some cocaine." At that point, J.C. asked Phillips to take them back to their car. M.B. stated Phillips refused, but said he would "in five minutes." M.B. stated that Phillips then put the knife to her left side. M.B. stated J.C. again asked Phillips to take them back to their car but he again refused. However, Phillips let J.C. out of the car. M.B. testified she attempted to grab hold of the knife but Phillips held both of her hands to her side. She stated Phillips still held the knife to her side and she was afraid.

M.B. stated that when J.C. came around to the passenger side of the car, M.B. told her to get back into the car. At that point, M.B. stated, Phillips pushed the knife farther into her side and told J.C. to go away from the car so that he could "make out" with M.B. M.B. testified she was still afraid.

M.B. stated that when J.C. walked away, Phillips started the car and sped off. M.B. stated she begged Phillips to go back and get J.C. Phillips said they would go back and get her shortly.

Phillips pulled the car into an alley. M.B. stated that he pointed the knife at her and told her, "As soon as you f--- me and make me come, we will go back and get your girl friend." M.B. stated that Phillips removed her clothes, removed his own clothing, and forced her to submit to vaginal intercourse. During the act, she attempted to move her purse, which she was sitting on, because it was hurting her. M.B. stated Phillips again pulled out the knife and said, "I will f--- you with this knife if I have to. What are you doing? What are you going to get in your purse?" She testified that Phillips also forced her to orally copulate with him.

M.B. stated that when, at one point, she had to urinate, Phillips allowed her to do so at the side of the car, but kept his hand on her head to restrain her from leaving. When they got back in the car and Phillips tried to force M.B. to orally copulate with him again, she opened the car door and ran, naked, down the alley. M.B. stated that at the mouth of the alley she saw a car with headlights on and motioned the driver to stop. The car was a marked police squad car. M.B. pointed out defendant's car to the officers and got into the squad car. M.B. stated defendant started his car and sped out of the alley. The police gave chase and eventually captured Phillips.

On cross-examination, M.B. admitted that she and J.C. willingly accepted Phillips' initial invitation to go to his car to smoke marijuana. She also admitted that later, when Phillips put the knife to her side, she did not tell him to take it away, but asked only what the knife was for. M.B. stated that Phillips "must have been" holding both of her hands with one of his hands while he restrained her because he kept the knife at her side. M.B. also stated that she recalled seeing the knife in Phillips' hand when he was removing her clothing.

On redirect examination, M.B. clarified that when J.C. got out of the car, M.B. reached her right hand over to get hold of the knife, but Phillips grabbed both of her hands.

J.C. testified on direct examination to the same facts leading up to her exit from Phillips' car. J.C. stated she eventually found her own car and, after unsuccessfully attempting to locate Phillips' car,

she returned to Evanston where the women were staying.

On cross-examination, J.C. admitted that she was aided by a police officer in locating her car, but she did not express to him any concern for M.B.

Phillips testified to a substantially different scenario. Phillips stated that after the women got into his car, which was parked on Rush Street approximately four blocks away from the intersection of State and Division Streets, he lit a marijuana cigarette and drove to a location under elevated train tracks near Wells Street. Phillips stated that, there, he began to "chop up" cocaine on a mirror with the knife. All three partook of the cocaine. Phillips stated that J.C. asked to get out of the car to be "socially tactful" because she saw him and M.B. "making out" in the front seat. Phillips stated that he did not restrain M.B. by holding her hands or by holding a knife to her side.

Phillips testified he then moved the car to an alley located approximately five minutes away near Ashland Avenue and Augusta Boulevard. During the drive M.B. did not ask him to let her out of the car, but did express concern for J.C. While in the car in the alley, he and M.B. engaged in consensual foreplay and oral sex. Phillips stated they were in the alley for approximately 20 minutes. He stated that, there, M.B. again voiced concern for J.C. Phillips testified a car came down the alley and they could see lights. At that point, M.B. quickly exited the car. Phillips stated that when M.B. ran out of the car he panicked and drove down the alley. Although he noticed that it was a police squad car following him, he did not stop. He was eventually arrested after fleeing on foot.

Chicago police officer Wally Velez testified that at approximately 4 a.m. on the morning in question, he and his partner, Paul Brugger, were in a squad car on patrol, travelling eastbound on Augusta Boulevard. Velez testified that he observed M.B., naked, running toward the police car. The officers immediately pulled over to the side of the street and gave assistance. M.B. said she had been raped. Velez stated she was hysterical. When the officers heard the sound of screeching tires, and M.B. identified defendant's car as it came into view, the officers gave chase. The car stopped at a fence. Phillips, naked, exited, fleeing on foot. Velez found Phillips hiding under a porch a short distance away and arrested him. Velez testified that when he searched the car a short time later he found the knife in an open position.

OPINION

On appeal, Phillips contends that the State failed to prove him guilty beyond a reasonable doubt. Phillips argues, generally, that

M.B.'s testimony was not sufficient to prove that her activity with Phillips was not consensual and that all of the circumstances preceding the sexual activity were consistent with a finding of consent.

It is the function of the trier of fact to weigh the evidence, resolve any apparent conflicts therein, and evaluate the credibility of the witnesses. (*People v. Nally* (1985), 134 Ill. App. 3d 865, 480 N.E.2d 1373.) In a criminal bench trial, these determinations are within the province of the trial judge. (*People v. Clemons* (1988), 175 Ill. App. 3d 7, 529 N.E.2d 577; *People v. Givens* (1977), 46 Ill. App. 3d 1035, 361 N.E.2d 671.) Furthermore, determination of the credibility and sufficiency of the evidence will not be reversed unless the evidence was so improbable as to create a reasonable doubt of guilt. (*People v. Hall* (1986), 114 Ill. 2d 376, 499 N.E.2d 1335.) Thus, as the Illinois Supreme Court has noted, once the defendant has been found guilty in a criminal bench trial, the applicable standard of review is " 'whether, after viewing the evidence *in the light most favorable to the prosecution,* any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis added.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Further, as in other criminal appeals, when reviewing a conviction for sexual assault, the testimony of a single witness, if it is positive and the witness credible, is sufficient to support the conviction, even though that testimony is contradicted by the accused. See *People v. Glover* (1971), 49 Ill. 2d 78, 273 N.E.2d 367.

The trial judge below, in the exercise of proper duty, heard all of the witnesses and observed the evidence presented. The complainant testified that although she initially consented to enter Phillips' automobile, she was later restrained by Phillips against her will from leaving his car, was driven to an alley some distance away, and was there forced by Phillips to engage in sexual acts to which she did not consent. M.B.'s initial consent to enter Phillips' car cannot reasonably extend to every subsequent event. Further, Phillips does not deny that he and complainant engaged in a sex act, but testified that complainant consented. At best, that evidence is merely conflicting. Resolution of the conflict was properly determined by the trial judge below. Reweighing of that evidence is outside the province of this court. Because the evidence here was only conflicting, and was otherwise sufficient to support the elements of the charges against Phillips, there exists no legally justifiable basis to disturb the trial court's judgment.

Phillips also contends his conviction for aggravated criminal sexual assault should be reduced to criminal sexual assault, and the cause remanded for resentencing, because the State failed to prove beyond a reasonable doubt that he was armed with a dangerous weapon, or with an object M.B. reasonably believed to be a dangerous weapon, based on the character of the knife.

The offense of aggravated criminal sexual assault is committed when, during commission of a sexual assault, the accused *"displayed, threatened to use,* or used a dangerous weapon *or any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon."* (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 12—14.) In determining whether a particular instrument constitutes a dangerous weapon, the supreme court has held:

" 'Where the weapon in question and the manner of its use are of such character as to admit of but one conclusion, the question whether or not it is deadly is one of law for the court to determine, but when the character of the weapon is doubtful or the question depends upon the manner of its use it is a question for the jury to determine from a description of the weapon, from the manner of its use and the circumstances of the case.' " (*People v. Robinson* (1978), 73 Ill. 2d 192, 202, 383 N.E.2d 164, 169, quoting *People v. Dwyer* (1927), 324 Ill. 363, 365, 155 N.E. 316, 317.)

For example, in *Robinson* the court concluded that a fingernail clipper containing a sharp, pointed fingernail file may constitute a dangerous weapon where testimony supports its use as such. *Robinson*, 73 Ill. 2d at 202, 383 N.E.2d at 169-70.

The knife that M.B. testified the defendant used in the sexual assault was admitted into evidence and was made a part of the record on appeal. It consists of two pieces: a two-inch sharpened metal blade with pointed tip attached to a plastic folding handle of the same approximate length, and a rectangular plastic piece into which the knife and handle, when folded together, conveniently fit.

M.B. testified that when Phillips initially displayed the knife, ostensibly to "cut up" cocaine, she expressed concern and asked what the knife was for. She also testified that Phillips later held the knife to her side, exerting, at one point, additional pressure, to keep her from exiting his automobile. She testified that she was afraid. She also testified that defendant brandished the knife immediately preceding the act of vaginal intercourse and threatened her with it. He again displayed and threatened her with the knife when she reached

for her purse during the assault. Although Phillips denies that he used the knife in such a manner, he does not dispute that he, indeed, displayed the knife.

Even if the court accepted defendant's argument that the knife's characteristics do not classify it as a dangerous weapon *per se*, no basis exists to reduce defendant's conviction given the trial record, containing M.B.'s testimony concerning the use of the instrument in the instant case. Again, the trial judge had before him the same physical evidence and was in the position to assess both M.B.'s and Phillips' testimony on the basis of credibility regarding the use of the knife. After observing the knife and hearing the above testimony, the trial judge concluded that sufficient evidence existed to sustain a conviction for aggravated criminal sexual assault. M.B.'s testimony alone provides a legally sufficient basis to support that conclusion and, therefore, in light of the proper scope of review to be exercised by the court on appeal, there exists no compelling reason to reduce defendant's conviction from aggravated criminal sexual assault to criminal sexual assault.

Lastly, in his opening brief Phillips challenges the constitutionality of the statute under which he was convicted of aggravated criminal sexual assault. Phillips also contends he was deprived of a fair trial through introduction into evidence of a pair of handcuffs recovered from his car and related comments made by the State during closing argument at the conclusion of trial. Phillips, however, failed to raise either issue in his written post-trial motion for a new trial and, consequently, has waived those issues for consideration on review. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.

For the above reasons, the judgment of the circuit court is affirmed.

Affirmed.

MURRAY, P.J., concurs.

JUSTICE PINCHAM, dissenting:
I dissent.

I

PREFACE

In reversing the conviction in *People v. Phipps* (1930), 338 Ill. 373, 380, almost 60 years ago, our supreme court held:

"It was long ago stated by Lord Hale in *regard to the charge of rape, 'that it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused though never so innocent.'* This statement has been approved by this court." (Emphasis added.)

This admonitory truism by Lord Hale approved by our supreme court is just as accurate and viable today as it was when it was first uttered by Lord Hale.[1] The case at bar is an irrefutable example of Lord Hale's axiom. There was no rape in this case.

The evidence convincingly establishes that Mary Berg engaged in consensual sexual activity with the defendant John M. Phillips, Jr. In this case, rape was an accusation easily made, hard to be proved, *"and harder to be defended by the party accused though never so innocent."* (Emphasis added.) 338 Ill. at 380.

There was no rape in this case. In this case, police officers came upon Mary Berg in a disgraceful and humiliating position, naked, engaging in voluntary sexual acts with her naked, newly met paramour, whom she knew by name, John M. Phillips, Jr., in his car, with his license plate with the letters, JMP JR, and which were his initials, affixed thereto, parked in an alley behind an occupied apartment building. In her frantic effort to avoid disgrace and regain her self-abandoned and forsaken honor, Mary Berg resorted to the ancient perfidious charges of rape and kidnapping, totaling 40 counts.

False rape accusations, instigated because of embarrassment, humiliation, remorse, fear, anger, disgrace and revenge continue to denigrate womanhood, victimize unwary males and plague the criminal justice system. (*People v. Taylor* (1971), 48 Ill. 2d 91; *People v. DeFrates* (1965), 33 Ill. 2d 190; *People v. Jackson* (1989), 178 Ill. App. 3d 785; *People v. Dick* (1987), 153 Ill. App. 3d 670, 511 N.E.2d 432 (Pincham, J., dissenting); *People v. Wright* (1986), 147 Ill. App. 3d 302, 497 N.E.2d 1261; *People v. Warren* (1983), 113 Ill. App. 3d 1, 446 N.E.2d 591; *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273; *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 276; *People v. Taylor* (1970), 121 Ill. App. 2d 403, 257 N.E.2d 524; *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801.) The judiciary should not succumb or become another prey to such odi-

---

[1]Apparently the court was referring to Sir Matthew Hale (1609-1676), who became a justice of the Common Pleas about 1654 and later a justice of the Court of the King's Bench. On May 18, 1671, he was created chief justice of the King's Bench, where he presided for between four and five years with great distinction. 24 Dictionary of National Biography 18-24 (Smith, Elder & Co. 1890) (edited by L. Stephen & S. Lee).

ous and baseless charges. To condone and uphold such fabrications does not provide the community, and more particularly, does not afford honest women their much needed protection from *bona fide* thugs and criminals who prey upon them.

There was no rape in this case. The evidence utterly fails to establish beyond a reasonable doubt that there was a rape in this case. Quite the contrary! The evidence affirmatively establishes beyond a reasonable doubt that there was no rape in this case. The law mandates that a trial court or jury's guilty finding which is not based upon or established by proof beyond a reasonable doubt is not permanently or indelibly chiseled in granite. The law holds it to be our solemn duty to set aside such a finding on review. The Supreme Court aptly pointed out in *Jackson v. Virginia* (1979), 443 U.S. 307, 317, 61 L. Ed. 2d 560, 572, 99 S. Ct. 2781, 2788, that a "properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and *the same may be said of a trial judge sitting as a jury.*" (Emphasis added.) Moreover, the Supreme Court held in *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068, for the first time, that the due process clause of the fourteenth amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. "Under *Winship*, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand." *Jackson v. Virginia* (1979), 443 U.S. 307, 317-18, 61 L. Ed. 2d 560, 572-73, 99 S. Ct. 2788.

An obviously innocent 33-year-old young man, who has no prior criminal record—not even an arrest—is the victim of a grave injustice in the justice system and languishes in jail because of an extremely indiscreet, but not illegal, sexual frolic in which he and his false accuser mutually agreed and participated. The law demands that we not close our eyes and blindly approve such an injustice. There was no rape in this case!

## II

### THE LEGAL SCOPE OF REVIEW

Throughout the history of this State, even before *Phipps*, and to the present, our supreme court has repeatedly, consistently, without deviation or variation, held "the rule in charges of rape" to be:

"[W]hile in some cases the uncorroborated testimony of the prosecutrix may justify a conviction for rape, in order to do so the testimony must be most clear and convincing." *People v. Phipps* (1930), 338 Ill. 373, 380, citing *People v. Freeman* (1910), 244 Ill. 590.

The United States Supreme Court pointed out in *Jackson v. Virginia* (1979), 443 U.S. 307, 321, 61 L. Ed. 2d 560, 575, 99 S. Ct. 2781, 2790, that review "courts can and regularly do gauge the sufficiency of the evidence without intruding into any legitimate domain of the trier of fact."

Our supreme court has repeatedly, consistently, and without deviation held that the scope of review in a rape case, as expressed by it in *People v. Qualls* (1961), 21 Ill. 2d 252, 257-58, 171 N.E.2d 612, in reversing the rape conviction, to be as follows:

"Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases. (*People v. Kazmierczyk*, 357 Ill. 592.) It is the further duty of a reviewing court, where a verdict is returned by a jury in a criminal case, not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged. *People v. Abbate*, 349 Ill. 147.

We are constrained to say, after a careful reading of the entire record, that *the testimony of the prosecuting witness lacks verisimilitude.*" (Emphasis added.)

In reversing the rape conviction in *People v. Faulisi* (1962), 25 Ill. 2d 457, 461, the supreme court held the scope of review to be:

"Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, (*People v. Qualls*, 21 Ill. 2d 252; *People v. Kazmierczyk*, 357 Ill. 592), and it is the duty of the reviewing court not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged. *People v. Qualls*, 21 Ill. 2d 252; *People v. Abbate*, 349 Ill. 147."

The scope of review of a defendant's rape conviction following his bench trial was stated in *People v. Anderson* (1974), 20 Ill. App. 3d 840, 847, 314 N.E.2d 651, 656, to be:

"Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases. Moreover, in

such cases it is the duty of the reviewing court not only to carefully review the evidence, but to reverse the judgment if that evidence does not remove all reasonable doubt and create an abiding conviction that the defendant is guilty of the crime alleged. (*People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211; *People v. Barfield* (1969), 113 Ill. App. 2d 390, 251 N.E.2d 923.)"

The court concluded in *Anderson*: "After the careful scrutiny of the State's evidence which is required of a reviewing court, we hold that evidence insufficient to remove all reasonable doubt and to create an abiding conviction" (20 Ill. App. 3d at 850) that there was a rape in the case, and reversed the conviction.

The supreme court reversed the rape conviction in *People v. Taylor* (1971), 48 Ill. 2d 91, and held the scope of review to be:

"[R]eviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, and it is the duty of the reviewing court not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged." 48 Ill. 2d at 98.

The trial court found the defendant guilty of rape in *People v. Reese* (1973), 14 Ill. App. 3d 1049, 1055, 303 N.E.2d 814, 819. This court reversed, and without remanding for a new trial, held:

"It is true that in a bench trial, it is the responsibility of the trial judge to determine the credibility of the witnesses and the weight to be given their testimony and, unless the evidence is so unsatisfactory as to raise a reasonable doubt of the defendant's guilt, the finding of the trial judge will not be disturbed. [Citations.]

However, *where the evidence of guilt is doubtful and uncertain*, as we believe it to be here, *and the explanation offered by defendant is positive* \*\*\*, *it then becomes our duty to reverse the conviction*, as we do here. [Citation.]" (Emphasis added.)

This court just recently held in *People v. Allman* (1989), 180 Ill. App. 3d 396, 401:

"*In those cases involving sex offenses, the reviewing court has a special duty to scrutinize the evidence closely.*" (Emphasis added.)

In spite of the foregoing unequivocal and unchallenged authorities governing the scope of appellate review, extending over a period exceeding a half century, in the case at bar the majority states:

*"[O]nce the defendant has been found guilty in a criminal bench trial, the applicable standard of review is 'whether, after viewing the evidence in the light most favorable to the prosecution,* any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis added.) *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." 181 Ill. App. 3d at 149.

My research does not reveal that our supreme court in *Collins* or in any other case expressly or by inference overruled the decades of uninterrupted and unchallenged authorities governing the scope of appellate review, as previously set forth, of a rape conviction, particularly where consent is the defense, and convincing evidence of consent is presented by both the prosecutor and the defendant. Compliance with the requirement of *Collins* of viewing the evidence in a light most favorable to the prosecution is not inconsistent or incompatible with a simultaneous compliance with the requirements that

"reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, and \*\*\* not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that the defendant is guilty of the crime charged" (*Taylor*, 48 Ill. 2d at 98)

as mandated in *Freeman, Phipps, Qualls, Abbate, Kazmierczyk, Faulisi, Taylor, Reese, Allman* and a multitude of other authorities, likewise so holding. When such compliance is done, the conclusion is inescapable that there was no rape in this case.

The majority in the instant case relies on and cites *Collins*, which in turn relies on and cites *Jackson v. Virginia* as authority for the proposition that the applicable standard of review by a State appellate court of the rape conviction in this case is to view all the evidence in the light most favorable to the prosecution. A mere cursory examination, however, of *Jackson v. Virginia* clearly reveals that it does not so hold. *Collins* was not a rape or sex case or a criminal bench trial. It is apparent from an analysis of *Jackson v. Virginia, Collins* and *Collins'* progeny that our supreme court did not intend in *Collins* and *Collins'* progeny to overrule the decades of the foregoing unchallenged, Illinois law governing the scope of appellate review in rape and other sex cases. If our supreme court had intended to do so, seemingly it would have so stated.

Before reviewing *Jackson v. Virginia,* however, it is noteworthy that *People v. Lewis* (1981), 88 Ill. 2d 129, appears to be the first Illinois authority expressing that the evidence on review is to be "viewed in a light most favorable to the Government." (88 Ill. 2d at 151.) Lewis was convicted by a jury of armed robbery, aggravated kidnapping and murder and sentenced to death. The testimony of an accomplice and other evidence were overwhelming of Lewis' guilt. Nevertheless, one of Lewis' contentions for reversal was that the evidence failed to prove his guilt beyond a reasonable doubt. In ruling adversely to the defendant's claim, the supreme court initially noted that "it will not disturb the jury's verdict of guilty unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." (88 Ill. 2d at 151.) The supreme court then held:

> "The United States Supreme Court has stated that the standard for reversing a jury's verdict on the ground of insufficient evidence is identical to the test of whether to submit the prosecution's case to the jury:
>
>> 'The prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt. *** Obviously a federal appellate court applies no higher a standard [in determining whether the evidence was insufficient to sustain guilt, *i.e.,* whether the prosecution failed to prove guilt beyond a reasonable doubt]; rather, *it must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision.'* Burks v. United States* (1978), 437 U.S. 1, 16-17, 57 L. Ed. 2d 1, 13, 98 S. Ct. 2141, 2150."

(Emphasis added.) 88 Ill. 2d at 151.

It is worthy of note, in my judgment, that in determining whether the evidence is insufficient to sustain a guilty finding, *Lewis* required that the verdict be sustained "if there is *substantial evidence* viewed in the light most favorable to the Government, to uphold the jury's decision." (Emphasis added.) (88 Ill. 2d at 151.) It appears to me that such a requirement is appreciably different than is the requirement to uphold the guilty finding simply if "after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements and the crime beyond a reasonable doubt," as pronounced in *Collins* and *Jackson v. Virginia.* (*Collins,* 106 Ill. 2d at 261; *Jackson,* 443 U.S. at 319, 61 L. Ed. 2d at

573, 99 S. Ct. at 2789.) An analysis of *Jackson v. Virginia* reveals why.

*Jackson v. Virginia* involved an appreciably different proceeding and issue than the direct appellate review in a State court of a claim of deficiency of evidence to sustain a guilty finding in a State court of the commission of a State criminal offense. In *Jackson v. Virginia,* the Supreme Court opinion, authored by Justice Stewart, preliminarily states:

> *"The question in this case is what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence."* (Emphasis added.) *Jackson,* 443 U.S. at 309, 61 L. Ed. 2d at 567, 99 S. Ct. at 2783.

The Supreme Court's foregoing statement of the question presented in *Jackson v. Virginia* is more than adequate persuasion that the Supreme Court did not, indeed the Supreme Court could not, except for minimum Federal constitutional standards, prescribe the scope of appellate review in the State criminal proceedings. *Jackson v. Virginia* prescribed the standard of review to be applied in a Federal court in a *habeas corpus* proceeding in which a State-convicted defendant claims that the evidence is insufficient to sustain his conviction. But because the manner in which the scope of Federal *habeas corpus* review of an evidence deficiency claim of a State court conviction, adopted in *Jackson v. Virginia,* conversely parallels the scope of appellate review in *Collins,* further discussion of *Jackson v. Virginia* is enlightening and guiding.

In *Jackson v. Virginia,* unlike in *Collins,* the Supreme Court pointed out that the issue in the case was the standard to be applied in a Federal *habeas corpus* proceeding to review the sufficiency of the evidence in a State conviction. Conversely, as again hereinafter pointed out, our supreme court in *Collins* did not state that the scope of appellate review, or a change or an alteration thereof, was an issue on appeal for the court's determination.

In *Jackson v. Virginia,* the trial judge found the defendant guilty of first degree murder. The defendant admitted the killing, but contended that because he was intoxicated and because he shot the deceased in self-defense, the requisite premeditation was absent, which precluded a first degree murder guilty finding under Virginia law. There was no appeal as of right from a criminal conviction in Virginia (*Saunders v. Reynolds* (1974), 214 Va. 697, 204 S.E.2d 421), and the defendant's petition for a writ of error, under Virginia Code, section 19.2—317, on the ground that the evidence was insufficient to support

a finding of premeditation and first degree murder, was reviewed on the merits by the Virginia Supreme Court, which denied the petition, the effect of which was to affirm the conviction on the merits. Thereupon, the defendant contested the validity of his Virginia conviction in a *habeas corpus* proceeding in the Federal court. Applying the "no evidence" criteria of *Thompson v. Louisville* (1960), 362 U.S. 199, 4 L. Ed. 2d 654, 80 S. Ct. 624, the district court found the record devoid of evidence of premeditation and granted the writ. The court of appeals reversed, holding that from the evidence of the defendant's reloading of his gun after firing warning shots, that he had had time to do so, that the victim was then shot not once but twice and the defendant's state of intoxication, there was some evidence from which the trial court could find premeditation. The Supreme Court stated that it granted *certiorari* in *Jackson v. Virginia* to consider the defendant's claim that "a federal *habeas corpus* court must consider not whether there was *any evidence* to support a state-court conviction, but whether there was *sufficient evidence* to justify a rational trier of the facts to find guilt beyond a reasonable doubt." (Emphasis added.) (*Jackson*, 443 U.S. at 312-13, 61 L. Ed. 2d at 569, 99 S. Ct. at 2785.) The Supreme Court concluded that in a Federal *habeas corpus* proceeding to review the sufficiency of the evidence to sustain a State conviction under Federal constitutional due process:

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be \*\*\* to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. \*\*\* [Citation.] \*\*\* *[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.* \*\*\* Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.
\* \* \*

\*\*\* A review of the record in the light most favorable to the prosecution convinces us that a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia law.
\* \* \*

\*\*\* Under the standard established in this opinion as necessary to preserve the due process protection recognized in *Win-*

*ship, a federal habeas corpus court faced with a record of historical facts that supports conflicting inference must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.* Applying these criteria, we hold that a rational trier of fact could reasonably have found that the petitioner committed murder in the first-degree under Virginia law.

For these reasons, the judgment of the Court of Appeals is affirmed." (Emphasis added.) 443 U.S. at 318-19, 324, 326, 61 L. Ed. 2d at 573, 577, 578, 99 S. Ct. at 2789, 2792, 2793.

If it is not clear from the foregoing statements of and quotes from *Jackson v. Virginia* that the Supreme Court of the United States did not therein alter or prescribe, or attempt to alter or prescribe, the scope of State appellate review of State criminal convictions to require State courts to "view the evidence in the light most favorable to the prosecution," any remaining doubt is completely resolved by the opinion of Justice Stevens, with whom Chief Justice Burger and Justice Rehnquist joined, concurring in the judgment in *Jackson v. Virginia.* Justice Stevens aptly and eloquently pointed out:

"Today the Court creates a new rule of law—one that has never prevailed in our jurisprudence. According to the Court, the Constitution now prohibits the criminal conviction of any person—including, apparently, a person against whom the facts have already been found beyond a reasonable doubt by a jury, a trial judge, and one or more levels of state appellate judges— except upon proof sufficient to convince a *federal judge* that a 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *Ante,* at 319, 61 L. Ed. 2d at 573.

The adoption of this novel constitutional rule is not necessary to the decision of this case. Moreover, I believe it is an unwise act of lawmaking. \*\*\* [I]ts precipitous adoption will adversely affect the quality of justice administered by federal judges. \*\*\*

\* \* \*

It is, of course, part of this Court's tradition that new rules of law emerge from the process of case-by-case adjudication of constitutional issues. Widespread concern that existing constitutional doctrine is unjust often provides the occasion, and is sometimes even relied upon as a justification, for the exercise of such lawmaking authority by the Court. Without entering

the debate over the legitimacy of this justification for judicial action, it is at least certain that it should not be the basis for dramatic—indeed, for *any*—constitutional lawmaking efforts unless (1) those efforts are necessary to the decision of the case at hand and (2) powerful reasons favor a change in the law." (Emphasis in original.) 443 U.S. at 326-27, 61 L. Ed. 2d at 578-79, 99 S. Ct. at 2793 (Stevens, J., concurring, joined by Burger, C.J., and Rehnquist, J.).

Thus, the new constitutional rule announced in *Jackson v. Virginia* is that in a Federal *habeas corpus* proceeding in assessing a defendant's claim that the evidence in his State conviction was insufficient to sustain the guilty finding, the Federal judge is to view the evidence in a light most favorable to the prosecution. *Jackson v. Virginia* does not require a State court of review, when assessing a defendant's claim of insufficiency of the evidence to sustain a guilty finding of the commission of a State criminal offense, to view the evidence in a light most favorable to the prosecution.

In *Collins*, which, as stated, cites and relies on *Jackson v. Virginia* as its authority, the jury found the two defendants guilty of three brutal murders, and the defendants were sentenced to death. On appeal before the supreme court of Illinois, the defendants contended, *inter alia*, that the evidence did not establish their guilt beyond a reasonable doubt. Realistically, however, the evidence of their guilt was literally overwhelming. An accomplice testified that he accompanied the defendants with the bound murder victims from an apartment to the location a short distance away, where the three bound murder victims were repeatedly shot in their backs, the back of their necks and heads and in their faces and chests with shotgun blasts and pistols fired by the defendants. Other witnesses observed the defendants taking their bound victims from the apartment to the car in which the defendants transported them to the murder scene. Still other lay and expert witnesses put the murder weapons in the defendants' possession, as well as the rope with which the victims were bound. One defendant had three prior felony convictions, one for robbery and two for armed robbery, one of which was committed while he was on parole from the penitentiary, while the other defendant had 10 previous armed robbery convictions. That their defenses, presented by witnesses who were drug users and convicted felons, were permeated with fabrication and perjury was clearly established by the prosecutor's cross-examination. With this factual background, it is beneficial to set forth our supreme court's *complete* discussion in *Collins*, in which it rejected the defendants' contention that the evi-

dence failed to establish their guilt beyond a reasonable doubt and announced the principle of "viewing the evidence in the light most favorable to the prosecution." *Collins*, 106 Ill. 2d at 261.

The supreme court's complete discussion in *Collins* on the issue is as follows:

> "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. [Citations.] Although the testimony of an accomplice is viewed with suspicion [citations], we have repeatedly held that it is sufficient to sustain a conviction if it satisfies the jury of the defendant's guilt beyond a reasonable doubt [citations]. When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. *As the United States Supreme Court observed in Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, *'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' The court went on to note that, '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.'* *** [Citation.]
>
> In view of these principles, we conclude that there is sufficient evidence to support the jury's verdict. Stated simply, the resolution of the defendants' guilt or innocence depended on the credibility of the witnesses and the weight given their testimony. It is well settled that these determinations are exclusively within the province of the jury. [Citations.] Similarly, it is for the jury to resolve any conflicts in the evidence. [Citations.] Here the jury was fully cognizant of the infirmities in [the accomplice] Nellum's testimony and was instructed that his testimony was to be viewed with suspicion. Nevertheless, the jury chose to believe Nellum over the defense witnesses, and after reviewing the record, we are not prepared to say that their conclusion was unreasonable." (Emphasis added.) *People v. Collins* (1985), 106 Ill. 2d 237, 261-62.

Again, it is worthy of note that our supreme court was obviously cognizant of its citation of, reliance on and quote in *Lewis*, the language of the United States Supreme Court in *Burks v. United States*

(1978), 437 U.S. 1, 16-17, 57 L. Ed. 2d 1, 13, 98 S. Ct. 2141, 2150, that on direct appeal of a criminal conviction "a federal appellate court *** must sustain the verdict if there is *substantial* evidence viewed in the light most favorable to the Government, to uphold the jury's decision." (Emphasis added.) (*People v. Lewis* (1981), 88 Ill. 2d 129, 151.) Our supreme court in *Collins* did not apply or adopt the aforestated *Lewis* direct appeal review criteria. Instead, our supreme court in *Collins* adopted the indirect Federal *habeas corpus* appellate review of a deficiency of evidence claim of a State conviction criterion, pronounced in *Jackson v. Virginia, i.e.,* "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Collins*, 106 Ill. 2d at 261.) Having recognized this distinction between *Lewis-Burks* and *Jackson v. Virginia,* and having adopted the former in *Collins*, it appears to me that had our supreme court also intended to overrule the foregoing authorities governing the scope of review in alleged rape-consent and other sex cases, it would have said so. Obviously, our supreme court, in *Collins*, was cognizant of its prior decisions on the scope of appellate review in alleged rape-consent and other sex cases. Apparently the court concluded that such scope was compatible and consistent with its newly announced mandate in appellate review to consider the evidence in a light most favorable to the prosecution, as pronounced in *Collins*.

After *Collins*, the supreme court of Illinois decided *People v. Linscott* (1986), 114 Ill. 2d 340, in which the defendant was charged with murder and rape but the jury found him guilty only of the murder and not guilty of the rape. The sole issue presented on review was whether the evidence proved the defendant guilty of murder beyond a reasonable doubt. The supreme court cited *Collins* and the aforestated quote from *Jackson v. Virginia,* "the verdict will not be disturbed unless the evidence, viewed in the light most favorable to the prosecution" (114 Ill. 2d at 348), and affirmed. Justices Clark and Simon dissented in *Linscott*, the former stating, "In my opinion the majority commits two errors. It applies the wrong standard of review, and it finds the evidence sufficient to sustain a conviction based on a mere suspicion of guilt. First, the majority fails to distinguish between appellate review of convictions based upon direct evidence and appellate review of convictions resting wholly upon circumstantial evidence. *** Second, using the proper standard, the evidence adduced here does not exclude a reasonable hypothesis of innocence." (*People v. Linscott* (1986), 114 Ill. 2d 340, 349, 356 (Clark, J., dissenting).) The supreme court in *Linscott*

again did not overrule its foregoing series of authorities governing the scope of appellate review in sex cases.

*People v. Byron* (1987), 116 Ill. 2d 81, is another conviction for murder, armed robbery and home invasion in which the evidence of the defendant's guilt was literally overwhelming. Nevertheless, the defendant argued that the evidence failed to establish his guilt beyond a reasonable doubt, which argument the supreme court rejected, citing *Collins* and quoting the exact language herein from *Collins*. Again, in *Byron* the supreme court made no mention of its multitude of prior decisions and holdings that in cases involving sex offenses the reviewing court has a special duty to scrutinize the evidence closely and to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt and to create an abiding conviction that the defendant is guilty of the crime charged.

In *People v. Sanchez* (1986), 115 Ill. 2d 238, which followed *Byron*, the defendant was found guilty by a jury of murder, aggravated kidnapping, deviate sexual assault, rape and attempted murder and sentenced to death. Peters, an accomplice, testified as a State's witness. His testimony, coupled with the testimony of a surviving shooting victim who also identified Sanchez as the assailant, and other evidence of defendant's guilt, the defendant contended, failed to prove defendant's guilt beyond a reasonable doubt, principally of the murders. The supreme court summarily treated the evidence regarding the offenses, pointed out that the testimony of an accomplice may be sufficient to convict and stated that, "A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of guilt." (*People v. Sanchez* (1986), 115 Ill. 2d 238, 260.) The supreme court in *Sanchez* also cited *Jackson v. Virginia* for the proposition that on review of an insufficiency of evidence claim the evidence must be considered in a light most favorable to the prosecution. But again, the supreme court did not hold in *Sanchez* that its many prior holdings governing the scope of review of the sufficiency of the evidence in alleged rape-consent and other sex cases were overruled, were no longer applicable, or were to be disregarded.

Following *Sanchez*, the supreme court decided *People v. Brackett* (1987), 117 Ill. 2d 170. Brackett was originally charged with rape, deviate sexual assault and aggravated battery. Subsequently the victim died, whereupon Brackett was additionally charged with murder. The murder charge was severed and, after a bench trial, the defendant was found guilty of rape and aggravated battery. At his second trial, the trial court found him guilty of the murder. The appellate court af-

firmed the murder conviction and vacated the rape and aggravated battery convictions. The supreme court granted leave to appeal and the defendant urged that the evidence was insufficient to prove causation, *i.e.*, a criminal agency caused the victim's death. The supreme court rejected the defendant's contention, pointed out that the trial judge found the evidence of causation to be sufficient and that the appellate court affirmed the trial court's ruling, and concluded:

"We have held that when presented with a challenge to the sufficiency of the evidence, \*\*\*. [Citation.] \*\*\* 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) \*\*\* and *we will not disturb this verdict unless this evidence is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to defendant's guilt* [citation]." (Emphasis added.) *People v. Brackett* (1987), 117 Ill. 2d 170, 176-77.

*Brackett* did not disturb the aforementioned decision of our supreme court on appellate review of an evidence deficiency claim in an alleged rape-consent or other sex offenses.

In *People v. Williams* (1987), 118 Ill. 2d 407, a jury found the defendant guilty of rape and armed robbery. Before the appellate court, the defendant contended that his identification as the assailant by the victim was unreliable and fatally flawed and that the evidence was insufficient to establish his guilt of robbery beyond a reasonable doubt. The appellate court affirmed the rape conviction and reversed the armed robbery conviction without any reference to the *Collins* decision. The appellate court also reversed the rape sentence and remanded for re-sentencing on the rape conviction. *People v. Williams* (1986), 145 Ill. App. 3d 482, 495 N.E.2d 1201. The supreme court granted the State's petition for leave to appeal in *Williams*, and without any reference to *Collins* regarding the rape conviction, and only referring to *Collins* regarding the robbery conviction, the supreme court affirmed both the robbery and rape convictions.

Neither the United States Supreme Court nor our supreme court discussed in any of the aforenamed authorities whether the presumption of innocence or constitutional due process is adversely impacted upon by a judicial requirement, on a defendant's claim that the evidence is insufficient to sustain a guilty finding, that ALL the evidence MUST be viewed in a light most favorable to the prosecution.

Whether the legislature or the supreme court is the proper forum for eliminating or altering the scope of appellate review need not be here discussed because the foregoing authorities and my further research do not indicate that the supreme court has done so. Ordinarily, elimination or alteration of rules of law, embodied in decades of long uninterrupted and indeed unchallenged case authorities, is not accomplished in a silent surreptitious manner, without notice to the bench, bar and public, and in the absence of briefing, argument and an authoritative opinion discussion on the subject by the court. Rather, the converse is true. Moreover, it is the duty of a court to rationalize and compatibly apply different rules of law and give each rule full force and effect whenever possible. It is therefore patently clear to me that our supreme court in *Collins* and *Collins'* progeny did not intend to overrule and eliminate *Phipps* and *Phipps'* progeny.[2] The foregoing legal appellate principles pronounced in *Phipps* and *Phipps'* progeny are compatible and reconcilable with the foregoing legal appellate principles pronounced in *Collins* and *Collins'* progeny.

Thus, a careful consideration of the evidence in the case at bar, in a light most favorable to the prosecution, does not remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crimes charged. Moreover, after carefully reviewing the evidence in the case at bar, and viewing it in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt, and the evidence is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to the defendant's guilt.

## III

### JULIE CHISHOLM'S, THE ALLEGED VICTIM MARY BERG'S AND THE DEFENDANT JOHN M. PHILLIPS, JR.'S DRINKING AND DANCING FROLICS

The majority's contorted diminution of the evidence, apparently inspired by its zeal for brevity, ignores pertinent facts, erroneously transforms and distorts others and corrupts rational conclusions and impressions from the facts presented. Thus, whatever concern I may have had for brevity is necessarily abandoned.

Mindful of the mandates and directives of the foregoing authorities, I carefully review in the light most favorable to the prosecution and examine the evidence in the case at bar aware that the complain-

---

[2] Not a single decision of any appellate court which cites or relies on *Collins*, set forth in the attached appendix, is contrarily decided.

ant, Mary Berg, contended that the sex acts were with force and against her will, and mindful of the defendant John M. Phillips' contrary contention that Mary Berg, while on a frolic, consented and volunteered to the sex acts, that there was no force, that the sex acts were not against Mary Berg's will and that her false rape accusation was instigated because of and to camouflage her humiliation and disgrace when the police unexpectedly came upon her and Phillips, both nude, engaged in sexual activity in Phillips' car.

Mary Berg testified that she was 26 years old and that she graduated from nursing school on June 21, 1985. On the following day, to celebrate her graduation, she and her girl friend of 20 years, with whom she grew up and attended school in Detroit, Julie Chisholm, also age 26 and also a registered nurse, drove Julie's car from their home in Wanwick, Michigan, to the Chicago area. They stopped at Berg's brother's home in Evanston and that night they drove to the Rush Street nightclub area in Chicago. On the following night, Sunday, June 23, 1985, about 11:30 p.m., Mary Berg and Julie Chisholm again drove, in Julie's car, from Evanston back to the Rush Street nightclub area in Chicago, where, Julie testified, she knew that young singles congregated. They went to a bar and drank alcoholic beverages. Mary testified that she had a Black Russian and Julie testified that she had a beer. They remained in that bar about a half hour, departed about 12:30 a.m. the morning of June 24 and went to another bar in the vicinity called Bootleggers.

They sat in the bar in Bootleggers, at which they observed the defendant, John M. Phillips, Jr., sitting. There was a dance floor in the back of the bar and music was playing. Phillips commenced a conversation with Mary and Julie, asking them about their hometowns. Mary Berg even testified (on cross-examination) that the defendant told them that his name was John Phillips, which is in fact the defendant's name.

Phillips testified that he had been in the bar about an hour when he observed Mary Berg and Julie Chisholm stagger through the door. He could tell that they had been drinking. Berg and Chisholm sat at the bar and he struck up a conversation with them. Phillips told them who he was, and gave them his correct name of John M. Phillips, and Mary Berg and Julie Chisholm told him who they were and that they were from Michigan. Phillips told Mary and Julie that he had lived in Saginaw, where he had gone to school, that he too had an extensive nursing background and that he rehabilitated and refurbished buildings and did dry wall construction for his livelihood. Phillips related that he bought Mary and Julie a drink, that there were two drinks for

one that night, they traded drinks back and forth and that he danced with Mary and Julie.

Mary, Julie and Phillips testified that Phillips danced with both Mary and Julie. Mary also testified that two drinks were being sold for the price of one and that she had a glass and a half of wine and a Stinger. Julie related that she had two beers. Mary and Julie stated that there was a large video screen in the bar, on which they watched sailing and skiing, and with the music playing, the place was pretty loud. They continued talking and dancing with Phillips and Mary related that she was having a good time. Phillips testified that Mary was the one in whom he was interested and that he was *"hitting on Mary at that time."* (Emphasis added.) Mary and Julie stated that they remained in the Bootleggers bar for about an hour or an hour and a half and that they, with Phillips, left Bootleggers and went to a third bar. Neither Mary Berg nor Julie Chisholm remembered the name of this third bar but they both estimated that the three of them were there about 20 minutes, during which they ordered more drinks.

## IV

### THE THREE AGREED TO USE DRUGS

Mary testified that Phillips suggested that they go out to Phillips' car and "do some drugs"—marijuana and cocaine. Mary related that Phillips wanted Mary to go alone and leave Julie in the bar but Mary told him no, "if we were going to go, all three of us were going to go." Mary told Julie that Phillips wanted to leave her and go with Mary "and do some drugs," but that Mary refused to go without her. Mary said that she was not going to leave without Julie.

The three of them left the bar and Mary and Julie took their drinks with them. En route to Phillips' car, they stopped at a McDonald's Restaurant, where Mary and Julie used the bathroom, and, according to Julie, "Mary and I talked about continuing to go to [Phillips'] car." Mary and Julie left McDonald's with Phillips and proceeded to his car. Mary and Julie described Phillips' car as a small black two-door Plymouth Champ. Julie got in the back seat and Mary got in the front seat.

The testimony of the 33-year-old defendant, John M. Phillips, Jr., up to this point parallels the testimony of Mary Berg and Julie Chisholm, except that Phillips attributed more alcoholic consumption to Mary and Julie than either admitted. Phillips stated that Mary consumed four drinks and Julie had three drinks at Bootleggers, that they bought the first round and "we traded [drinks] back and forth."

Mary and Julie's willingness and desire to go with a complete stranger to his car to use drugs could rationally be attributed to either their inebriation or their desire to use drugs or even to both.

Significantly, Phillips testified that in their initial meeting Mary Berg and Julie Chisholm gave him their names and he gave them his name, told them that he too had lived in Detroit and that he too had an extensive nursing background. This pertinent testimony by Phillips was uncontradicted but indeed was corroborated by Mary Berg or Julie Chisholm.

Phillips related that his car was parked on Rush Street about four blocks away and he asked Mary and Julie to accompany him to his car "to smoke a joint and do some coke." He stated that they walked to the car, he unlocked the door and they entered. Phillips', Mary's and Julie's testimonies were in accord that Julie sat on the backseat, Mary sat on the front passenger seat and Phillips sat on the driver's seat.

Mary and Julie both testified that Phillips looked in the glovebox, took out a "marijuana joint," lit it, smoked it and "asked us if we wanted to hit it," but that they refused.

Having accepted the invitation of Phillips, a total stranger, to go with him to his car "to do some drugs"—marijuana and—cocaine and displaying a knowledgeable familiarity with the drug parlance, after arriving and entering Phillips' car, and, according to them, declining Phillips' offer to smoke the marijuana, the inevitable question becomes patently obvious. Why then did Mary and Julie go to Phillips' car with him? If they did not want to use drugs with Phillips, they need only have declined his offer to go to his car with him, but they didn't. They both admittedly accepted his invitation.

Julie testified that they voluntarily, with no force or threats, walked down the street with Phillips to his car, that she knew that Phillips was going to his car "to do some drugs," that "Phillips was going to be smoking marijuana or doing some other drugs," but that she didn't take any of the marijuana that Phillips offered her.

Mary Berg testified that Phillips asked her and Julie to accompany him "to do some marijuana and cocaine," that she and Julie left with him, that no one compelled or forced her to go, that she went to Phillips' car anticipating and expecting to see marijuana and cocaine and that she went to the defendant's car to smoke a joint of marijuana herself, but that when Phillips offered her the marijuana cigarette in his car, she refused. Berg stated that when Phillips offered her the marijuana cigarette, she did not get out of the car, nor did she ask Phillips to take her back to Bootleggers, or back to their car.

Phillips testified that when they arrived at and entered his car on

Rush Street, Mary and Julie smoked a marijuana cigarette with him in his car. Phillips stated that his car was parked on a busy one-way street, that there were a lot of traffic and people on the street and, because they were parked right on the street getting high, Phillips suggested that they move to a place more secluded so they wouldn't be seen smoking the marijuana.

Berg and Chisholm related that Phillips said that he was going to drive the car to a more secluded, less crowded area, away from the main street where all the people were. Neither Berg nor Chisholm asked Phillips to let her out of the car, not to leave, or not to go to an isolated area, although, according to them, neither had any intention to use drugs when they arrived there.

Phillips stated that he drove to a more isolated area, under the elevated train tracks at Wells and Chestnut Streets, where there was a big open lot on the southwest corner and no parked cars. Phillips stated that en route the three of them finished smoking the marijuana cigarette. On cross-examination, Phillips testified:

"Q. It's your testimony that Julie and Mary are lying when they said they didn't share your marijuana cigarette?

A. *Yes, it was the expressed purpose to go to the car to get high. That's why they went there with me.*" (Emphasis added.)

Mary Berg admitted that Phillips had the marijuana cigarette in his hand and smoked it en route from crowded Rush Street to secluded Wells and Chestnut Streets.

## V

### ALL THREE USED COCAINE
### AND
### MARY AND PHILLIPS' FOREPLAY

Phillips stated that when they arrived at Wells and Chestnut Streets he and Mary *"started making out."* (Emphasis added.) Phillips related that he went in the glove compartment and took out some cocaine, a mirror and knife "to chop up the coke." Phillips stated that Mary held the mirror while he chopped up the coke. He made three lines on the mirror and all three of them consumed the coke that was cut up on the mirror.

Phillips again urges that the purpose of Mary Berg's and Julie Chisholm's accompanying him to his car, and thereafter to the more secluded location, was to use drugs—marijuana and cocaine—and if such was not their purpose, then what was? Phillips further urges that Berg's and Chisholm's false trial testimony denying that they

used marijuana and cocaine that morning was primarily motivated by their fears that sworn admissions by them in open court that they possessed and used marijuana and cocaine, illegal drugs, could possibly adversely affect their recently acquired nursing licenses and their nursing careers. Additionally, Phillips urges, being nurses, paragons and models of excellence and perfection, an in-court admission that they used illegal drugs would be embarrassing to them, and, they no doubt suspected, would also adversely affect their credibility as witnesses. Phillips concludes that their reasons to testify falsely about not having used the drugs, coupled with their acknowledgement of the foregoing surrounding facts and circumstances and Phillips' contrary testimony, creates a well-founded suspicion of the veracity of their denial and an abiding conviction, and certainly a convincing belief, that they did participate with Phillips in using the drugs.

Phillips testified that after they used the cocaine he and Mary *"continued to make out."* (Emphasis added.) Julie was sitting on the back seat with her eyes closed. Julie asked Phillips to drive her back to her car and Phillips told her that he would do so in a few minutes. Julie then asked to be let out of the car. Phillips further testified:

"Q. When Julie got out of the car, when she asked to get out of the car, did she say why she was getting out of the car or wanted to get out of the car?

A. *I think she was being socially tactful to leave us alone.* *** *She saw us making out sitting in the back seat.*

Q. Just before she asked to get out of the car what, if anything, were you and Mary doing?

A. *We were making out and she was acting like she was asleep, but obviously she was awake."* (Emphasis added.)

Phillips stated that he leaned forward, let the seat up and Julie got out of the car on the driver's side, walked around to the passenger window where Mary was sitting and asked Mary for a cigarette. Julie then walked away to the end of a building. Phillips could see where Julie was standing.

With the exception of her denial of the smoking of the marijuana and using the cocaine, Julie Chisholm's versions of the incidents are harmonious with and convincingly corroborative of Phillips' versions. Julie related that when they arrived at the secluded area from Rush Street and stopped the car, in which she was in the backseat, she put her feet upon the backseat and put her head back. Julie described Phillips' car as a black Champ Plymouth, a very small car, with bucket seats, with the front passenger seat and the driver's seat split.

At this point in the sequence of events it is worthy of note, indeed

it is quite significant, that not only had Phillips given Mary Berg and Julie Chisholm his correct name, John Phillips, and other personal facts about himself, but also, the uncontradicted and corroborated evidence established that the black two-door, bucket seat 1980 Champ Plymouth car was Phillips' car, was registered to Phillips in Phillips' name, with Illinois 1985 passenger vehicle license plate letters JMPJR, the defendant, John M. Phillips', initials, and that Phillips was a junior.

Julie Chisholm's version of the events when they arrived at the isolated area of Wells and Chestnut completely corroborates Phillips' version, except Julie denied consuming any cocaine in the car. Julie testified that as she sat in the rear seat of the car, she heard Mary say, "What's the knife for?" Mary admitted that Phillips opened the glove compartment, pulled out a mirror, a plastic bag and a knife and that she asked him, "What is the knife for?" and that Phillips responded, "to cut up some cocaine." (The knife is contained in the record on appeal and its description and Mary's testimony about it, hereafter set forth, clearly establish that because of its frail construction and small size it was not and could not have been a threatening weapon to Mary or Julie. Both Mary and Julie testified that when Mary asked Phillips, "What's the knife for?" Julie then asked Phillips to drive them back to their car, and that Phillips said he would take them back in about five minutes.

Julie Chisholm not only testified that she did not use any cocaine there, she also testified that she did not even see any knife. She also denied that she told Chicago police detective Dan Centracch that John Phillips took out a knife and a mirror and cut the coke. Detective Centracch's testimony contradicted Julie's testimony. The assistant State's Attorney stipulated that if called as a witness, Chicago police detective Dan Centracch would testify that on June 24, 1985, Julie Chisholm told him that when Phillips parked his car at Wells and Chestnut Streets, Phillips took out a knife and mirror and started to cut cocaine.

## VI

### JULIE CHISHOLM'S DEPARTURE

The testimony and actions of Julie Chisholm throughout the remainder of the episodes contradict Mary Berg's testimony and conduct. The testimony and conduct of the two cannot be rationally reconciled. But, far more importantly and significantly, the testimony and conduct of Julie Chisholm throughout the remainder of the events

is in direct harmony with and is completely corroborative of defendant Phillips' testimony and behavior. Julie's departure from Mary and Phillips, her subsequent police escort to her car in the Rush Street area and her return to Evanston, without seeking the policeman's aid for Mary, created an irreconcilable imbroglio with Mary's version of the occurrences. If Phillips threatened Mary with a knife, or otherwise, Julie certainly would not have left her. On the other hand, if Julie left Mary and Phillips because of or with knowledge that Phillips had threatened or was threatening Mary with a knife, or otherwise, after her departure, Julie certainly would have sought police assistance for Mary. If Julie had in any way thought, feared or suspected that Mary was in danger with Phillips, she would have sought assistance for Mary. Instead, when Julie departed and came upon the police, Julie never mentioned to the police that her childhood friend, Mary, was endangered by a man, who was a total stranger, with a knife in a car parked in an alley nearby. Julie had the police to escort her back to her car in the Rush Street area. Julie got in her car, returned to Evanston and went to sleep.

Mary unsuccessfully endeavored to resolve this dilemma by inferring in her testimony that as Julie got out of the car and shortly thereafter departed, Julie did not see and did not know that Phillips was threatening Mary with the knife. The ridiculous fallacy in this version and resolution by Mary is simply that, if Phillips was threatening Mary, and Julie was mysteriously unaware thereof, then surely Mary would have told Julie about it so Julie would not leave the car. Certainly, when Julie was safely out of the car, Mary would have disclosed Phillips' unrevealed threats so that upon Julie's departure she would obtain aid and return.

Julie's and Mary's testimonial versions of Julie's exit out of and departure from the car and Mary's testimony of Phillips' simultaneous threats against her with the knife are irreconcilably inconsistent but banteringly revealing.

Julie Chisholm related that when she asked Phillips to let her get out of the car, Phillips opened the door on the driver's side, pulled up the seat, leaned forward and let her out of the car. Julie stated that she walked around to the front and over to Mary's side of the car where her window was partially opened. Julie said to Mary, "Come on, let's go." Mary said to Julie, "Just get back in the car." Julie repeated to Mary, "Let's go," and Mary repeated to Julie to get back in the car. Julie Chisholm then testified on direct examination:

"Q. And did the defendant say anything at that time?

A. *He told me to go sit over in the corner; that he wanted to*

*be with Mary for 15 minutes to make out.*

Q. What did you say after he said that?

A. *Then I think I asked Mary for a cigarette.*

Q. Did she say anything or give you a cigarette or anything?

A. No.

Q. What did you say then?

A. *So I just said I was going to go back to the car myself.*

Q. What did you do?

A. *I started walking away and went back to my car.*

\* \* \*

Q. What happened?

A. I went back about four or five blocks and couldn't find my way and *a police car was driving and I asked him to give me a ride back to my car.*

Q. Did he do that?

A. Yes.

Q. When you got back to your car, what did you do?

A. I sat there about five minutes.

Q. And then what did you do?

A. Then I drove back, I tried to find my way back to where we were underneath the bridge.

Q. To where you left Mary and the defendant?

A. Right.

Q. Did you find them?

A. No, I did not.

Q. Where did you go then?

A. So I was driving around for about an hour and then I tried to head back to the apartment to see if they were over there and I got back to the apartment.

Q. This is in Evanston, now?

A. Right.

Q. What happened when you got back there?

A. So I got back there and I saw a black Champ parked outside in front of the apartment. I was relieved. I thought they were there. I went up to the apartment, nobody answered, so I just drove around and kind of looked for them outside. I didn't see them. I sat back in my car a half hour or so and I fell asleep." (Emphasis added.)

Julie Chisholm further expounded on cross-examination that when she stood at the passenger door of Phillips' car and asked Mary for a cigarette and Mary did not give her one, she left the area. She related

that she flagged down a policeman who gave her a ride back to her car, during which time she never told the policeman that she had the slightest concern about Mary. After she arrived at her car, she unsuccessfully drove around to see if she could find Mary and Phillips. While she was driving around looking for them, she did not stop and call the police. Julie drove back to Mary's brother's apartment in Evanston, knocked on the apartment door and when no one answered, Julie got back in her car and went to sleep. Julie's conduct certainly is not the conduct of a woman who has just left her life-long friend in the dangerous clutches of a rapist.

I momentarily leave but later return to Julie Chisholm asleep in her car in front of Mary Berg's brother's apartment in Evanston.

## VII

### THE "KNIFE"

The "knife" was adequate to cut up cocaine, for which purpose Julie and the defendant stated it was used. To anyone observing the fragile, delicate and meager size of the "knife," it is glaringly apparent that the "knife" was inadequate to be used as a weapon of force or as a threat for rape. Mary's testimony, as hereinafter set forth, clearly established such.

Although Julie testified that she heard Mary ask Phillips, "What's the knife for?" Julie was not asked and she did not testify whether she heard Phillips' response, which according to Mary was "[T]o cut up some cocaine."

Again, I note that Phillips testified he used the knife to chop up the cocaine, while Mary held the mirror and that the three of them consumed the drug. Phillips further stated that when he was finished with the knife and cocaine he put the knife on the floor under the seat.

Julie testified that she never saw the "knife," but from her testimony and conduct upon alighting and departing from Phillips' car, it is patently apparent that she did not in any way perceive that Mary was in any danger with Phillips. In fact, Julie testified that when she got out of the car, Phillips told her *"he wanted to be with Mary for 15 minutes to make out,"* that she then asked Mary for a cigarette and when Mary did not give her one, Julie said, *"I was going to go back to the car myself."* (Emphasis added.) En route to her car, Julie testified that she flagged down a police officer, to whom she never mentioned that Mary was in any danger. In fact, Julie never mentioned Mary at all to the officer.

The "knife" is contained in the record on appeal before us, but be-

fore I herein endeavor to verbally describe it, I initially set forth its following description as related by the defense attorney in the trial court:

> "Your Honor, this is the kind of utensil that you use to clean your fingernails with. I would assume Judge, without having a ruler in my hand that the blade on this plastic knife is no more than two inches in length; no more at all. This is not the kind of weapon if you will, that someone carries with them if they think that what they're going to do with this is force someone against their will and comply with their wishes. You would break this thing. I'm sure I could do it very easily *** with a minimal amount of force. That's a plastic handle, the width of which the blade I would make to be between a quarter of an inch or a half inch. That's not the weapon used by a person who intends to persuade people by the utilization of force to comply with his force against their own will. It simply is not.
>
> * * *
>
> That knife that was exhibited in this case, that was introduced into evidence, *** the blade is approximately as long as half of my thumb. I think it was about an inch and a half long. It was about a quarter of an inch wide. That is the kind of device that people use to separate lines of cocaine. That is what they use it for. You can't use it in a knife fight. *** It has a very limited and small function, to separate things.
>
> That knife is not indicative at all of a sexual assault that occurred as a result of force. All it does, Judge, is corroborate what John Phillips said they went there to do; a line of cocaine, and smoke a joint, and what you do with a line of cocaine is separate it with a little bitty implement. You can use a credit card. That will work. You can use a little bitty knife like that."

The prosecuting attorney recognized and inferentially agreed that the "knife" could hardly be classified as a threatening weapon, when he stated:

> "Whether or not Your Honor chooses to believe that this knife is a deadly weapon ***. It is certainly a possibility this weapon's a possible element, a possibility of use of force by the Defendant.
>
> * * *
>
> It may be small, but it's sharp. It's kind of funny it comes from an auto parts store and not from somebody who does fingernails. *The weapon in this case Judge, isn't only that knife.*"

Perhaps an appropriate starting point for a description of the "knife" is a statement of what it is not. It is not a pen knife and it is

not a pocket knife. It is a frail metal blade two inches in length, a quarter of an inch wide, attached to a two-inch by one–fourth-inch plastic handle by an axel pin. As inferred by the foregoing description of the assistant State's Attorney, it is an advertisement souvenir from an automobile supply store. It resembles a folding finger nail file and appears to be no more menacing, as clearly demonstrated by Mary Berg's testimony.

Even though we have the "knife" before us for our observation, the aforementioned trial attorney's commentary description of it, Mary Berg's and Julie Chisholm's foregoing testimony regarding it and the testimony of Mary Berg about it which follows, and because of the position I take on Phillips' conviction on this appeal, that there was no force, but consent, and thus, no rape, I need not decide whether the "knife" can be classified as "a dangerous weapon" or as an "object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon" under the provisions of the aggravated criminal sexual assault statute of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 12–14(a)(1)).

Briefly, recapitulating a portion of the evidence, Mary Berg related that when Phillips opened the glove compartment, pulled out a plastic bag, a mirror and the "knife," and she asked, "What is the knife for?" and Phillips responded, "[T]o cut up some cocaine," Julie asked Phillips to take them back to their car. Phillips responded that he would shortly. Julie then asked to get out of the car and Phillips moved his, the driver's, seat forward, opened the door on the driver's side and Julie got out of the car, came around to Mary's, the passenger's side, of the car, and asked Mary for a cigarette. When asked on direct examination what she did then, Mary Berg responded, "I attempted to put my right hand underneath and grab hold of the knife." She claimed that Phillips grabbed and held both her hands to her side and simultaneously held the "knife" in her side. On redirect examination Berg testified:

"Q. Mary, though you didn't say anything about the knife, what, if anything, did you try to do with the knife when Julie went around the car?

A. I reached my right hand over and *I was going to try and grab the knife and break it* or grab it out of his hand, and he said, 'hey, what the f--k are you doing,' and grabbed my two hands.

Q. That's when he had your two hands with his hand?

A. Yes." (Emphasis added.)

Strangely, Julie did not see any of this tug-of-war between Mary

and Phillips. But even if this testimony of Berg were true, which Phillips denied, and in which denial he was corroborated by the testimony of Julie Chisholm, the testimony demonstrated that the "knife" was not so threatening or menacing that Berg was afraid of it. This testimony also demonstrated that Berg perceived the "knife" to be so frail that she was unafraid to attempt to "grab the knife and break it," or, alternatively, to "grab it out of [Phillips'] hand." At this point Berg related on direct examination that Phillips with one hand grabbed and held her two hands while he held the "knife" in his other hand. Mary Berg stated on cross-examination:

"Q. And Mr. Phillips had a knife in his hand?
A. He had it in my left side.
Q. But it was in his hand?
A. Yes.
Q. So he was holding both of your hands with one of his hands?
A. He must have been."

Berg's and Phillips' relative physiques thus became significant. The record discloses that Phillips was no giant hulk over Berg. Rather, the record conversely discloses that Berg was larger and younger than Phillips. Berg testified that on the morning of the occurrences she was in good physical condition, that she was 5 feet 5 inches tall, weighed 142 pounds and was 26 years of age. Phillips' description of himself was that he was a white male, 5 feet 6 inches tall, weighed 130 pounds and was 32 years of age. Phillips was one inch taller than Mary but he was 12 pounds lighter than she.

Berg stated that she made no effort to get out of Phillips' car because she was afraid, that she did not say anything to Julie about the knife in her side, also because she was afraid, and that she did not give Julie the cigarette Julie asked for because Phillips was holding her hands, which Julie did not see, all of which is patently ludicrous, and that *Phillips asked Julie to give them 15 minutes and said, "so I can make out with her"* and that *Julie walked away towards the end of the block*, which is rational and makes sense. (Emphasis added.)

Phillips denied that he had the knife in his hand when he leaned forward, pushed his seat up and let Julie out of the car. He stated that at no time did he ever stick the knife in Mary's side, and Phillips also denied that he grabbed or held Mary Berg's hands.

The majority's statement that Phillips, "does not dispute that he, indeed, displayed the knife," although accurate for what it states, is grossly inaccurate and misleading in its purported implication. (181 Ill. App. 3d at 151.) Phillips never admitted, but indeed persistently de-

nied, that he displayed or in any way used the knife to threaten or to intimidate Mary Berg.

## VIII

### THE DRIVE TO THE SEX SCENE
### THE FOREPLAY
### THE NUDITY
### THE SEX ACTS

Phillips testified that Julie walked away to the end of a building about 30 or 40 feet away and he then drove off. Phillips stated that he drove to an alley at Ashland and Augusta Streets, about a five-minute drive, during which Mary Berg expressed a concern for Julie, but did not ask him to let her out or make any attempt to get out of the car.

Mary Berg related that Phillips drove for about five minutes to what "looked like a bad neighborhood *** the inner city," during which she expressed a concern, not for her own safety in the car with Phillips, who had the "knife," but rather, she expressed quite nobly and understandably a concern for the welfare of Julie. But according to Julie's testimony, Julie flagged down a police officer to whom she never mentioned her own or Berg's dangerous predicament with Phillips. Berg testified:

"Q. What were you doing during this ride?

A. I was pleading and begging him to go back and get my girl friend. He couldn't leave her there. It was a bad neighborhood. She was by herself walking. I didn't think she knew where she was because he had driven away from Rush Street.

Q. What did he say to you when you were saying that to him?

A. He said, 'We will go back and get her in five minutes.'

Q. What did you say? Did you keep insisting?

A. Yes, I did. *I was starting to cry and becoming a little anxious and nervous.*

Q. How many times did you tell him to go back and get your girl friend?

A. I pleaded and begged with him the whole way there. I told him she might get murdered or robbed or mugged or something, and I just couldn't leave her there." (Emphasis added.)

Mary Berg stated that a part of this five-minute drive by the defendant, with force and against her will, was on an expressway. Phillips denied that the drive was with force or against Berg's will or that any part of it was on an expressway. If Berg's version of the jour-

ney is accepted, it would appear to be rather unusual that Phillips, bent on rape, would take his unwilling victim onto a busy thoroughfare such as an expressway. Berg stated further that they came to a stoplight after they got off the expressway, but when they did so, she made no attempt to get out of the car.

Mary Berg did not explain how or whether Phillips held the knife while he drove on the expressway and the five minutes to the alley, where Phillips parked behind an occupied apartment building. She testified, however, that after Phillips stopped in the alley, he pointed the knife at her and told her that she was going to have sexual intercourse with him. Mary Berg further testified:

"Q. How far was the knife from you at that time?
A. It was pointed right at me.
Q. Was it up against your skin?
A. No, no, but he had it in his hand pointing it at me."

Mary Berg stated that she was in the passenger seat, that Phillips pulled the lever down so that the back of the passenger seat went all the way back "like [she] was laying [sic] back." Berg testified that Phillips then "proceeded to rip my clothes off me." Berg said that she had on a pair of white slip-on shoes, a pair of white pants, a jacket, a sweater vest, underpants and a bra. Berg related further, on cross-examination:

"Q. When Mr. Phillips drove the car to the alley and parked his car, did he take your clothing off of you?
A. Yes, he did.
Q. *And was he able to do that with one hand?*
A. *I don't know.*
Q. Did you see the knife in his hand during that period of time when you first arrived and your clothing was being removed?

\* \* \*

A. I believe so, yes.
Q. Did you ever see him put it down while you were in that car parked in the alley?
A. *He put it down a couple times, yes. I don't know where he put it though.*

\* \* \*

Q. Now when you said he put the knife down a couple times when he took your clothes off, did he use both hands?
A. I think he had the knife in his hand when he began.
Q. *But you don't know where it was at that point after he started taking your clothes off?*

A. *No."* (Emphasis added.)

Phillips testified just the opposite; that after they arrived in the alley, he and Berg engaged in "foreplay." He denied that he had the "knife" in his hand, or that he threatened Berg, or that he ripped Berg's clothing off. Phillips stated that at no time during the "fore-play" did Berg ask him to stop and that Berg voluntarily took her own clothing off.

The clothing that Berg wore at that time, which she testified Phillips ripped off of her, was admitted into evidence as People's exhibits. Although these garments are not before us on this appeal for our inspection, Berg testified that none of her clothing was ripped or torn.

The facts of the case at bar up to this point closely resemble the facts in *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801, where the defendant told the complainant his correct name and drove her in his own car to an isolated area, and then, according to the complainant, forcibly removed her slacks and undergarments and raped her on the front seat of his car. Kepler admitted that he removed the complainant's clothing and, like Phillips, Kepler contended that the act of intercourse was consensual. The complainant's clothing in *Kepler*, like Berg's clothing in the case at bar, was not torn or in any way damaged. In *Kepler*, this court reversed the defendant's rape conviction. Evidence of the alleged rape victim's torn and ripped clothing from the defendant's supposed forced disrobing of the victim was also absent in *People v. Nellons* (1984), 130 Ill. App. 3d 908, 475 N.E.2d 208, and *People v. Szybeko* (1962), 24 Ill. 2d 335, in which the rape convictions were reversed.

Mary Berg related that not only did Phillips take her clothes off, but that Phillips also completely disrobed himself. What Berg did, or what Phillips did with the "knife," while Phillips disrobed and became nude is not revealed in the record. It would appear to be most unusual that a man bent on raping his victim, in his car, parked in an alley, behind an occupied apartment building, would himself completely disrobe. He would have to be insanely oblivious to any concern for detection and escape. The rape verdict was reversed in *People v. Nellons* (1984), 130 Ill. App. 3d 908, 475 N.E.2d 208, where the complainant similarly testified that the defendant, after disrobing her, disrobed himself and then raped her.

Phillips testified that during their "foreplay," Berg took off her own clothes and he disrobed himself, after which they engaged in further "foreplay," in which they engaged in consensual, reciprocal oral sex, all of which consumed an estimated 20 minutes. Conversely, Berg

testified that Phillips forced her, against her will, to have oral and vaginal sexual intercourse with him. Phillips denied that there was vaginal intercourse and denied that their mutual oral sex was with force or against Berg's will.

Berg related that during their intercourse and while Phillips was on top of her, she was lying on her purse and because it was hurting her, she told Phillips, "I just want to pull it out from underneath me. It is hurting me," that she got her purse out from under her and it was thrown to the back of the car on the floor.

Berg also related that during their 20 minutes of sex acts, "[she] had to go to the bathroom real bad," and "Phillips let me out of the car to go to the bathroom." She said that she got out of the car on the passenger side and Phillips jumped out of the car, blocked her and told her that she could not go out of his sight. Berg stated that she squatted right there and urinated. Phillips was an unusually considerate rapist. He was concerned for the physical comfort or discomfort of his victim. But Mary testified however that Phillips had his hand on her head and held her hair while she urinated. Berg related that after she urinated, *"[she] jumped back in the car because [she] was afraid."* (Emphasis added.) Phillips argues that this testimony of Mary Berg is preposterous, and even more so when considered in conjunction with her hereinafter set forth testimony of her subsequent bolting from Phillips' car.

Berg additionally testified that while she performed oral sex on Phillips she had a piece of gum in her mouth, that Phillips told her to remove it, and that she did so.

During the sex acts, according to Berg's testimony, the "knife" apparently played a rather insignificant threatening role because it did not deter Berg from at least mildly resisting Phillips. On direct examination, Berg testified:

"Q. What were you doing with your hands the first time he tried to get on top of you?

A. *I SUPPOSE I was pushing him away trying to get him off of me.*

\* \* \*

Q. You weren't looking at him when he was taking your clothes off, were you?

A. No.

Q. What were you doing?

A. *I was crying and thrashing about and trying to fight him off,* not fight him off of me, but trying to prevent it." (Emphasis added.)

According to the following testimony of Mary Berg on recross-ex-

amination, again, the "knife" played no influence whatsoever in her resistance.

> "Q. While you were trying to fight him off as you just testified, were you able to injure him?
>
> * * *
>
> A. No.
> Q. Did you scratch him?
> A. No.
> Q. Did you slap him?
> A. I didn't—*I pushed him away from me.*" (Emphasis added.)

Cases are legion which hold that to sustain the charge of forcible rape, presently designated criminal sexual assault, the evidence must establish beyond a reasonable doubt that the sexual intercourse was committed by force and against the will of the female, and if she has the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. *People v. Qualls* (1961), 21 Ill. 2d 252, 258; *People v. Faulisi* (1962), 25 Ill. 2d 457, 461; *People v. Taylor* (1971), 48 Ill. 2d 91; *People v. DeFrates* (1965), 33 Ill. 2d 190; *People v. Anderson* (1974), 20 Ill. App. 3d 840, 851, 314 N.E.2d 651.

Phillips relies on Berg's foregoing testimony of her resistance or lack thereof, not necessarily to establish that Berg's resistance was inadequate to establish rape, but rather as evidence that Berg was not threatened by the "knife," and as corroboration of his testimony that Berg did not resist at all and that the sex act was consensual. Phillips testified that at no time while he was in Mary Berg's company did he strike, hit, slap, curse, or threaten Mary Berg and that he did not in any way attempt to do so.

## IX

### THEIR EMBARRASSING DETECTION WHILE NUDE
### AND
### THEIR NUDE FLIGHT

Phillips testified that they heard and saw a car coming in the alley with its headlights and spotlight on. It was a marked police car. Berg bolted out of Phillips' car and ran to the police car. Phillips stated that he and Berg were both high from the alcohol and drugs.

Phillips urges that when Berg saw the marked police squad car, Berg panicked, out of fear of being caught by the police in what she considered to be an embarrassing and humiliating predicament and ap-

prehensive about the consequence thereof on her newly acquired nursing license. Phillips also urges that Mary Berg knew that there was evidence of narcotics usage, narcotic paraphernalia and possibly narcotics in Phillips' car and that if the police were to apprehend her in Phillips' car, it could possibly jeopardize her nursing license and devastate her nursing career. Phillips contends that these factors and these factors alone, and not rape, motivated Berg, when she saw the police squad car, to bolt from Phillips' car to the police car and falsely accuse him of rape.

Although Berg did not directly so testify, she testimonially inferred that she did not see the police car when she initially fled Phillips' car and that she did not see the police car in the alley until she had run quite some distance from Phillips' car. She stated that she flagged down the officers, who thereafter gave chase and apprehended the defendant.

It is difficult to perceive Berg's testimony that, following 20 minutes of various sexual acts with Phillips, through force, against her will, and, while afraid to flee, and even after Phillips became flaccid, that she would then belatedly flee, after the acts had been forcibly committed upon her, with no aid or assistance in sight. Why would or should she then flee? The defendant was flaccid and, according to Mary Berg, he had already forcibly performed and completed his sex acts upon her. Why flee, if no help was visible or available? That the marked police squad car was the first car she saw when she fled and it just happened to be there, certainly substantiates Phillips' version that Berg bolted from his car when she saw the marked police squad car because she was embarrassed and not out of any fear she had of Phillips.

Phillips candidly confesses that he, too, panicked when the police squad car approached and when Berg bolted nude from his car. He also was nude. There were drugs, drug paraphernalia and evidence of recent drug usage in his car.[3] Phillips had no prior criminal record and he had never been arrested before. Phillips fled nude in his car. The police officers gave chase with their siren and mars light on. Phillips ran his car into a fence and damaged it. He fled nude on foot. He hurdled several fences and broke his ankle when he jumped down into a concrete gangway. The officers found and arrested Phillips lying under a porch,

[3]Phillips testified that when he was released from custody on bail and picked up his car, "roaches"—partly smoked marijuana cigarettes—were on the floor of the car and the mirror was in the glove compartment. This testimony was uncontradicted. The "knife" used to cut the cocaine and Mary Berg's clothing were seized from the car by the officers when Phillips was arrested.

with his feet and ankles swollen and nude except for his socks. The officers took him to a hospital where he was treated for his broken ankle. They also transported Berg to the hospital where her vaginal smear failed to reveal spermatozoa, which Phillips argues corroborates his testimony that he did not have vaginal intercourse but only oral sex with Berg.

## X

### THE HANDCUFFS

The officers retrieved Berg's clothing from Phillips' car. The officers also retrieved the "knife" from Phillips' car, but that was not all. They also retrieved a pair of handcuffs from his car. Berg never mentioned any handcuffs and never testified that she even saw them in Phillips' car. Chisholm did not utter one word of testimony about the handcuffs and Phillips did not say anything about them during the entire evening. There was absolutely no evidence that the handcuffs had any relevancy in the case or to the charges for which Phillips was on trial. Yet, over Phillips' objection, the trial court granted the State's motion and admitted them into evidence. In urging the trial court to find Phillips guilty, the prosecutor made the following fallacious and irrelevant argument regarding the handcuffs:

"[W]ho would flee from the police and have a set of handcuffs in his car under the seat, which we believe bears on what his intent was at that time. What is a person who rebuilds buildings doing with handcuffs in the car? Is that like a billyclub you keep in the car to keep yourself from getting robbed? No. That can be used for only one thing, that's restraining a human being. He never got a chance to use the handcuffs. He admitted, even though she wanted to go to her friend, he wouldn't let her go.

\* \* \*

He's the kind of guy who keeps handcuffs under the front seat when he goes out on Rush Street shopping for women. What's he going to do with handcuffs? What kind of women is he looking for on Rush Street or whatever women he finds, what does he intend to do with them once getting into the car using cocaine and marijuana as the carrot, using a knife as the stick once he gets her there.

\* \* \*

Your Honor can see what the plan of a man like this is who goes out on Rush Street with handcuffs in his car."

There was absolutely no basis in the evidence for this foregoing

argument. We have no way of discerning from the record before us the extent to which this argument or the handcuffs influenced the trial court in reaching its guilty findings. Admission of the handcuffs into evidence was erroneous, the prosecutor's foregoing arguments about the handcuffs were also erroneous, and the trial court erred in relying on the handcuffs or in being persuaded by the prosecution's argument about them in arriving at the guilty verdicts, which tilted the scales of guilt against the defendant. This was plain error, even though not properly assigned in the post-trial motion, for which the defendant's conviction should be reversed.

## XI

### THE FINALE

The officers transported Berg from the hospital to her brother's home in Evanston, where they discovered Julie Chisholm asleep in her car in front of the apartment, tranquilly and patiently awaiting Phillips and Berg's arrival.

Phillips argues that Berg's subsequent telephone inquiries from Michigan about her hospital examination results are a further manifestation of Berg's anxieties about the impact of her conduct on the night in question on her career as a licensed nurse. Phillips contends that being a licensed nurse, Berg would naturally deny having used illegal drugs, in order to protect her nursing license from possible revocation. Phillips further argues that Berg's telephone inquiries to the hospital at which she was examined were not to "inquire whether an alcohol level had been drawn *** or for *** personal reasons." Berg admitted that she had been drinking alcohol that morning and it would be ludicrous for her to later call the hospital and inquire if her blood showed an alcohol content. She knew that it would. Phillips argues therefore that Berg's telephone inquiry to the hospital was really to find out if her blood showed the presence of marijuana or cocaine, that Phillips swore she consumed with him, and which inquiry, Phillips argues, Berg would naturally deny. Upon denying on cross-examination that she consumed marijuana or cocaine on the morning of June 24, Berg further testified:

"Q. While you were at the hospital, St. Mary of Nazareth Hospital on West Division Street here in Chicago, did they draw blood from you?

A. I believe they did. I really don't remember.
* * *
Q. Were you concerned about the level of blood alcohol in

your system after you left the hospital on June 24th of 1985?

A. I inquired, I called the hospital from Michigan and I wanted to find out what kind of results came back from the medical exam, and when I was on the phone, *I did inquire whether an alcohol level had been drawn on me or not for my own personal reasons.*

Q. And did the person that you spoke to at the hospital tell you that your blood was not submitted for chemical analysis to determine the alcohol level in your blood?

A. Yes, they did.

Q. *And did the person tell you that your blood had not been submitted to a toxicologist to determine the existence of any barbiturates or any marijuana in your blood?*

A. *I didn't inquire about that."* (Emphasis added.)

Phillips urges that Berg's foregoing response that she did not inquire whether her blood had been submitted to a toxicologist, or whether a toxicologist had determined the existence of any barbiturates or marijuana in her blood, because of the aforementioned circumstances, is naturally suspect. Phillips contends that the true purpose of Berg's call to the hospital was to learn if her blood had been toxicologically examined and that Berg knew the results would have been positive for drugs if her blood had been so examined.

## XII

### THE CONCLUSION

After the foregoing careful review of the evidence, in a light most favorable to the prosecution, as required by the beforementioned decisions of the supreme court, it is clear that no rational trier of fact could have found the essentials of the crimes charged beyond a reasonable doubt, that the evidence fails to and is insufficient to prove the defendant's guilt beyond a reasonable doubt and to create an abiding conviction that the defendant is guilty of the crimes charged, that the evidence establishes beyond a reasonable doubt that the defendant is not guilty of the crime charged, and that the evidence is so unreasonable, improbable and unsatisfactory that it creates and leaves a reasonable doubt of defendant's guilt. The defendant's testimony is corroborated by the testimony of the State's witness, Julie Chisholm, and, as the supreme court stated in reversing the rape conviction in *People v. Qualls* (1961), 21 Ill. 2d 251, 257-58, 171 N.E.2d 612, Mary Berg's testimony in the case at bar lacks verisimilitude. The defendant's judgments of conviction should there-

fore be reversed. Accordingly, I dissent.

APPENDIX

The following are Illinois cases of appellate review in which *People v. Collins* (1985), 106 Ill. 2d 237, and the sufficiency of the evidence considered in a light most favorable to the prosecution, to sustain a guilty finding, are cited and discussed:

| | PEOPLE v. | YEAR | CASE NO. | CHARGE |
|---|---|---|---|---|
| 1. | *Devalle* | 3/17/89 | 87—1034 | attempt murder |
| 2. | *McBounds et al.* | 2/22/89 | 86—0369 | murder |
| 3. | *Roy & Emmaline Williams* | 1/27/89 | 87—0060 & 87—0187 | rape |
| | | | ILL. APP. 3D | |
| 4. | *Phillips* | 1989 | 181, 144 | rape |
| 5. | *Fountain* | 1989 | 179, 986 | battery |
| 6. | *Avant* | 1989 | 178, 613 | robbery |
| 7. | *Call* | 1988 | 176, 571 | DUI |
| 8. | *Hetzel* | 1988 | 176, 630 | obstructing a police officer |
| 9. | *Johnson* | 1988 | 175, 908 | burglary |
| 10. | *Barlett* | 1988 | 175, 686 | battery |
| 11. | *Whitlock* | 1988 | 174, 749 | murder |
| 12. | *Bedony* | 1988 | 173, 613 | murder |
| 13. | *Barnett* | 1988 | 173, 477 | attempted murder |
| 14. | *Roy* | 1988 | 172, 16 | drugs |
| 15. | *Ludell* | 1988 | 172, 26 | drugs |
| 16. | *Daniels* | 1988 | 164, 1055 | rape |
| 17. | *Lee* | 1987 | 164, 155 | murder |
| 18. | *Pace* | 1987 | 163, 1012 | battery |
| 19. | *Page* | 1987 | 163, 959 | murder |
| 20. | *Harris* | 1987 | 162, 618 | burglary |
| 21. | *Whitecotton* | 1987 | 162, 173 | rape |
| 22. | *Powell* | 1987 | 160, 689 | perjury |
| 23. | *Rodgers* | 1987 | 160, 238 | retail theft |
| 24. | *Chaney* | 1987 | 157, 552 | aggravated kidnapping/rape |
| 25. | *Brown* | 1987 | 154, 696 | drugs |
| 26. | *Boone* | 1987 | 152, 831 | murder |
| 27. | *Ramierz* | 1986 | 151, 731 | burglary |